Althea E. TALLEY, et al.,
Appellants/Cross–
Appellees,

v.

Vijay M. VARMA, M.D., et
al., Appellees/Cross–
Appellants.

Nos. 95–CV–796, 95–CV–1271, 96–
CV–1008 and 96–CV–1009.

District of Columbia Court of Appeals.

Argued Sept. 5, 1996.
Decided Jan. 30, 1997.

---

Barry J. Nace, Washington, DC, for appellants/cross-appellees.

Brian J. Nash, Rockville, MD, and Stuart N. Herschfeld, Bethesda, MD, for appellees/cross-appellants.

Before TERRY, STEADMAN and KING, Associate Judges.

KING, Associate Judge:

Althea E. Talley and her husband Gregory B. Talley (collectively "Talley") brought a medical malpractice negligence action in the Superior Court of the District of Columbia against Vijay M. Varma, M.D., and Varma's employer, the George Washington University Medical Center (collectively "Varma"). Talley appeals the grant of Varma's motion for directed verdict on one liability theory, the adverse verdict on a second theory of liability, and the imposition of costs against her. Varma cross-appeals contending that the trial court erred in not granting the motion for directed verdict on the second theory of liability, and erred in the calculation of costs. We affirm the judgments in each appeal.

Mrs. Talley suffered almost total, permanent loss of taste following radiation treatment by Dr. Varma to ablate (remove) any remaining thyroid tissue left in Mrs. Talley after surgery to remove her cancerous thyroid gland. The case was presented to the jury on two separate theories: (1) that Dr. Varma breached the standard of care by administering too much radioactive iodine ("I–131") to Mrs. Talley, which caused the injuries sustained by her ("causation" issue); and (2) that Dr. Varma did not inform Mrs. Talley of the risks and benefits associated with I–131 and failed to advise her of alternative treatment methods ("informed consent" issue).

At the close of Talley's evidence, Varma moved for a directed verdict contending both that Talley had failed to prove the causal nexus between the alleged violation of the standard of care and the injuries sustained, and that Talley failed to establish an issue of informed consent to be resolved by the jury, arguing that because there were no known previous cases of permanent loss of taste, Dr. Varma had no duty to inform Mrs. Talley of such risk. The trial court denied Varma's motion on the informed consent claim, but granted the motion on the causation issue. With respect to the latter, the court stated:

> As to causation, I find the defendant's argument compelling and not the least bit rebutted by anything argued by the plaintiff, that the issue in this case is not whether the radioactive iodine treatment caused the loss of taste.

> The issue is whether, by violating what Dr. Hoffer considers to be the standard of care in giving 150 millicuries as opposed to 125 or less, *whether that additional 25 or more millicuries is the cause of the permanent loss of taste.*

> Taking Dr. Hoffer's testimony in the light most favorable to the plaintiffs, I do not see that he said that. He indicated, in general, that the increase in dosage slightly increased risk in general, that doesn't make it more probable than not.

> And it was made quite clear from cross-examination that he had no basis to believe that an additional 25 millicuries is what is responsible for the loss of taste and that it

would not have occurred had he been within the standard of care and given 125 or less.

So, on that first prong of negligence, I don't think we have a case to go to the jury.

(emphasis added). The trial then resumed on the remaining issue of informed consent. At the close of all evidence, Varma again moved for a directed verdict, which the court denied. The jury later returned a verdict in favor of Varma on that issue. Varma thereafter moved for an allowance of costs in the amount of $38,528.11. Judge Abrecht, however, ordered that plaintiffs pay defendants $3,658.29 in costs.

In No. 95–CV–796, Talley contends that the trial court erred in granting Varma's motion for a directed verdict as to the issue of causation, and that the adverse verdict on the informed consent issue must be reversed because of trial court errors;[1] in No. 95–CV–1271, Talley contends that the trial court improperly awarded costs to the defendants.

On cross-appeal, in No. 96–CV–1009, Varma argues that the trial court erred by denying Varma's motions for a directed verdict on the issue of informed consent;[2] in No. 96–CV–1008, Varma argues that the trial court failed to properly award costs to him.

We hold, in this medical malpractice action involving the administration of radioactive iodine prescribed by the defendant, that the plaintiff failed as a matter of law to prove that an assertedly excessive amount itself was the cause of her injury. We also hold that expert witness fees may not be taxed as costs in excess of the statutory amount, and that under the facts of this case, the trial judge did not err in taxing certain other costs to the plaintiff.

## I. Underlying Facts

In October 1990, after biopsies of her thyroid gland showed follicular neoplasia (probable cancer), Mrs. Althea Talley underwent surgery for removal of her thyroid gland.

---

**1.** In her attack upon the verdict for Varma on informed consent, Talley raises three issues which do not merit more than summary consideration. First, in her main challenge, Talley contends that the second reinstruction given to the jury was confusing, misleading, and failed to accurately portray the evidence, and that the trial court should have reread the Pattern Jury Instruction a third time. "In general, decisions regarding reinstruction of a jury are committed to the sound discretion of the trial court; absent abuse of that discretion we will not reverse." *Whitaker v. United States,* 617 A.2d 499, 501 (D.C.1992); *accord Gay v. Augur,* 97 U.S.App. D.C. 336, 337, 231 F.2d 495, 496 (1956) (the scope of reinstruction is within the discretion of the trial court). We find no abuse of discretion here. We are satisfied that the jury instruction and reinstructions given, taken as a whole, fairly and accurately summarized the evidence and applicable law, and that the reinstructions were accurate responses to the jury's questions.

Second, Talley contends that the trial court erred by mismanaging discovery, specifically, by failing to preclude the testimony of one of Varma's expert witnesses when Varma failed to produce the expert for a deposition. However, Talley admits in her brief that she cancelled the deposition because defense counsel had scheduled it contingent on Talley agreeing to take the deposition of another defense witness during trial. A trial court has broad discretion to impose discovery sanctions, *see Vincent v. Anderson,* 621 A.2d 367, 373 (D.C.1993), and its resolution of discovery problems "will not be disturbed upon appeal unless discretion has been abused." *Rosenthal v. National Produce Co.,* 573 A.2d 365, 374 (D.C.1990). There is no evidence in the record that the contingency was imposed in bad faith or in violation of the pretrial orders.

Third, Talley contends that the trial court displayed such open and obvious prejudice toward Talley's counsel as to have the effect of denying Talley a fair trial. A trial judge bears the responsibility for the orderly and fair administration of a trial, and has " 'not only the right, but the duty ... to participate directly in the trial, including the propounding of questions when it becomes essential to the development of the facts of the case.' " *In re J.A.,* 601 A.2d 69, 76 (D.C.1991) (quoting *Womack v. United States,* 350 A.2d 381, 383 (D.C.1976)) (omission in original). The test for whether a trial was fatally tainted with alleged prejudice by the judge is whether the impartiality of the judge might reasonably be questioned. *Id.* at 78; *Scott v. United States,* 559 A.2d 745, 748–49 (D.C.1989); *see generally Liljeberg v. Health Servs. Acquisition Corp.,* 486 U.S. 847, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988). We do not think that the alleged manifestations of prejudice come at all close to entitling Talley to relief under that standard.

**2.** Because we affirm the trial court's grant of a directed verdict on the issue of causation, and because the jury found for Varma on the issue of informed consent, it is not necessary to address Varma's contention that the trial court erred by not granting the motions for a directed verdict on that issue.

Because the surgeon could not safely remove all of the thyroid tissue, some tissue remained after the surgery. This is a common occurrence and is not an issue in this case. Pathology reports confirmed that Mrs. Talley's thyroid gland was cancerous. She was referred to Dr. Vijay Varma of George Washington University Medical Center ("GWUMC") for consultation regarding radioactive iodine treatment ("I–131") to destroy any remaining thyroid tissue.

Mrs. Talley contacted Dr. Varma's office and arranged for necessary blood tests and for a diagnostic scan. The scan used a ten millicurie ("mCi") dose of I–131. Mrs. Talley did not report any alteration in taste following this initial dose of I–131. On November 12, 1990, Mrs. Talley met with Dr. Varma and several resident physicians concerning her scan results. Dr. Varma recommended that Mrs. Talley should receive a dose of 150 mCi of I–131 to ablate any remaining thyroid tissue and cancer cells. At trial, Dr. Varma testified that he informed Mrs. Talley of the risks, benefits and alternatives to I–131 treatment at the November 12 consultation. Mrs. Talley testified, however, that Dr. Varma never informed her of any risks, benefits or alternative treatments. Mrs. Talley agreed to the recommended treatment and signed a consent form the same day.

On November 14, Mrs. Talley was admitted to GWUMC for the I–131 treatment, and received a 150 mCi dose. After the treatment she experienced a metallic taste in her mouth but did not inform anyone about it, although she did complain of a swollen neck the next day. Mrs. Talley was discharged on November 16. On November 26, Mrs. Talley discovered large brown spots on her tongue and immediately contacted Dr. Varma. At this time, she also told him that she had a metallic taste in her mouth and that the taste had been there since the I–131 treatment. Dr. Varma saw Mrs. Talley on November 27 and referred her to a taste and smell specialist at Georgetown University. The specialist

performed a biopsy of Mrs. Talley's tongue and determined that she had lost ninety-six to ninety-eight percent of her taste buds. The loss is apparently permanent.

At trial, Talley's expert, Dr. Hoffer, testified that in his opinion the standard of care for Mrs. Talley would require a maximum I–131 dose of 100 mCi, that a dose of 150 mCi would not be within that standard of care, and that giving a dose of 150 mCi to Mrs. Talley was a violation of the standard of care. He gave his opinion that increased doses of I–131 increase the risk of complications such as those experienced by Mrs. Talley. Dr. Hoffer also testified that in his opinion, to a reasonable degree of medical certainty, the ablative dose of radiation therapy caused Mrs. Talley's injury. However, Dr. Hoffer testified during cross-examination that the outside edge of the standard of care was a dose of 125 mCi, with a plus or minus ten percent variance.

Dr. Hoffer never testified, however, that there was any difference in causative effect between a dose of 125 and 150 mCi. His testimony on the risks and benefits of increased doses consistently referred to doses of 100 mCi versus 150 mCi.[3] Furthermore, when explaining alternate ways of treating Mrs. Talley, Dr. Hoffer stated that one alternative was a lower dose of 100 mCi, but "that wouldn't guarantee that she's not going to develop sialitis and taste bud difficulties." On cross-examination, he testified that he had never seen a permanent loss of taste, in his own practice, from treatment with I–131, but he had read an article documenting permanent loss of taste with doses as low as 10 mCi. Dr. Hoffer conceded that while he gives his own patients initial dosages of 100 mCi or less, some of his patients have to return for further treatment in which he gives them additional doses of 150 to 200 mCi, resulting in cumulative I–131 dosages between 250 and 600 mCi. Dr. Hoffer agreed that an initial dose of up to 400 mCi could be within the standard of care, depend-

3. For example, Dr. Hoffer testified that 150 mCi is not within the standard of care for Mrs. Talley because "there is no benefit in going to 150 millicuries from 100 millicuries in such a benign lesion." In response to counsel's question "what is your opinion ... as to the benefit versus the

risk of giving to a patient such as Mrs. Talley 150 mCi versus 100 mCi?", Dr. Hoffer answered, "I think there's a small but documentable difference in the incidence of complications,... the incidence of complications increases slightly with such a dose."

ing on the condition of the patient. Finally, Dr. Hoffer testified that he had seen temporary loss of taste at doses of 100 and 125 mCi.

At the close of Talley's evidence, Judge Abrecht granted Varma's motion for a directed verdict on the issue of causation, and denied Varma's motion on the issue of informed consent. The trial then continued on the latter issue. At the close of all evidence, Varma again moved for a directed verdict on informed consent; Judge Abrecht again denied the motion, but the jury returned a verdict for Dr. Varma on that issue.

## II. Proximate Cause

■ The parties agree that the I–131 treatment was the likely cause of Mrs. Talley's loss of taste. Talley contends that she presented sufficient evidence of causation to require the issue to be submitted to the jury, *i.e.*, that she presented evidence that Dr. Varma breached the standard of care by giving her a 150 mCi dose of I–131, and evidence that she was injured as a result of the I–131 treatment. Varma essentially concedes that the radioactive material itself caused Mrs. Talley's injury but denies that the allegedly negligent component of the dosage caused the harm. He contends that the directed verdict on the causation issue was proper because Mrs. Talley failed to present evidence that her injury was occasioned by a difference of 25 mCi—that is, that the giving of 150 mCi, rather than 125 mCi, was the proximate cause of the injury.

■ In a medical malpractice action alleging negligence, the plaintiff bears a three-part burden to establish a *prima facie* case. She must establish "(1) the applicable standard of care; (2) a deviation from that standard of care by the defendant; and (3) a causal relationship between *that deviation* and the plaintiff's injury." *District of Columbia v. Anderson*, 597 A.2d 1295, 1297 (D.C.1991) (emphasis added); *see also Bunn v. Urban Shelters & Health Care Systems, Inc.*, 672 A.2d 1056, 1059 (D.C.1996); *Washington v. Washington Hosp. Ctr.*, 579 A.2d 177, 181 (D.C.1990); *Psychiatric Inst. of Washington v. Allen*, 509 A.2d 619, 623–24 (D.C.1986); *Kosberg v. Washington Hosp. Ctr.*, 129 U.S.App.D.C. 322, 324, 394 F.2d 947, 949 (1968). The first two elements, the standard of care and violation of the standard of care, are not at issue here—the trial court granted Varma's motion for a directed verdict because it concluded that Talley had not met her burden to establish causation; viz., that "that deviation" caused her injury.

■ To establish causation, the plaintiff must present evidence from which a reasonable juror could find that there was a direct and substantial causal relationship between the defendant's breach of the standard of care and the plaintiff's injuries, and that the injuries were foreseeable. *Psychiatric Inst. of Washington, supra,* 509 A.2d at 624; *Lacy v. District of Columbia*, 424 A.2d 317, 320–21 (D.C.1980). While there is no requirement that the plaintiff exclude every other possibility, the mere fact that the I–131 treatment resulted in injury to Mrs. Talley does not establish that the alleged overdose caused it. *See, e.g., Quin v. George Washington Univ.*, 407 A.2d 580, 583 (D.C.1979); *Christie v. Callahan*, 75 U.S.App.D.C. 133, 148, 124 F.2d 825, 840 (1941). Talley's argument, that she has shown a breach of the standard of care and an injury, implies that the burden of production then shifts to the defendants. At the very least, a plaintiff could not invoke any alleged shift of the burden of production without first demonstrating that the injury ordinarily does not occur in the absence of negligence.[4] *See Quin, supra,* 407 A.2d at 583; *Harris v. Cafritz Memorial Hosp.*, 364 A.2d 135, 137 (D.C.1976); *accord, Hazen v. Mullen*, 59 App.D.C. 3, 5, 32 F.2d 394 (1929) (negligence of physician for injuries from X-ray treatment is not proven when the injury may occur even if the highest skill is exercised in treatment). Talley's evidence does not warrant such an inference of negligence by Dr. Varma. *See Quin, supra,* 407 A.2d at 583; *Harris, supra,* 364 A.2d at 137; *Quick v. Thurston*, 110 U.S.App.D.C. 169, 172–73, 290 F.2d 360, 363–64 (1961) ("Due to the great variety of infections and complications which, despite all precautions and skills,

---

4. We need not here explore whether such a demonstration would in fact result in a shift of the burden of production. *See* W. PAGE KEETON ET AL.,

sometimes follow accepted and standard medical treatment, courts reject the notion that because [injury] follows a treatment an inference of negligence is to be made.").

In *Harris*, the court affirmed a directed verdict in favor of the defendants in a medical malpractice action because the plaintiff presented no expert opinion that the injury would not have occurred if due care had been exercised. 364 A.2d at 138. Talley also failed to present such evidence. Talley's expert testified that, in his opinion, a dose of up to 125 mCi of I–131 was within the standard of care, but never opined that Mrs. Talley's injury would not have occurred if she had received 125 mCi or less. In fact, Dr. Hoffer testified that loss of taste, albeit temporary, was known to occur at even lower doses, including at the 100 mCi dose he thought was appropriate for Mrs. Talley.

As the trial court ruled, Talley's evidence failed to show that an increase in risk from increased dosages of I–131 made it more probable than not that the allegedly excessive dose Talley received caused her injury. At best, Dr. Hoffer's testimony on increased risk merely raised the possibility that the injury resulted from the allegedly excessive amount, particularly in light of the absence of testimony from Dr. Hoffer about any difference in effect from 125 to 150 mCi.[5] In addition, Dr. Hoffer admitted that he gave some of his own patients I–131 doses of 150 to 200 mCi, yet had never seen an injury such as Mrs. Talley's. Taken as a whole, Dr. Hoffer's testimony did not establish the requisite degree of likelihood that any negligence by Varma caused Talley's injury.

■ It is well settled that in medical malpractice actions "[a] mere scintilla of evidence is not enough to require the submission of an issue to the jury.... [The] preliminary question for the judge [is] not whether there is literally no evidence, but whether there is any upon which a jury can properly [find for the party with the burden of proof]." *Gunning v. Cooley*, 281 U.S. 90, 94, 50 S.Ct. 231, 233, 74 L.Ed. 720 (1930);

see also *Bunn, supra,* 672 A.2d at 1059 (directed verdict is appropriate provided there is no legally sufficient evidentiary basis for a reasonable jury to find for that party); *Corley v. BP Oil Corp.*, 402 A.2d 1258, 1263 (D.C.1979) (reversing directed verdict where there was sufficient evidence to support an inference of negligence).

■ "[M]edical testimony as to the mere possibility of a causal relation ... is not sufficient standing alone, to establish such relation," particularly where the causation element is unclear. *Sponaugle v. Pre–Term, Inc.*, 411 A.2d 366, 368 (D.C.1980) (citations omitted); *accord Quick, supra,* 110 U.S.App. D.C. at 172, 290 F.2d at 363. In *Sponaugle*, the plaintiff's medical expert witness testified that the defendant physician's failure to remove an intra-uterine device ("IUD") from the plaintiff was "a probable proximate cause" of the plaintiff's injury. 411 A.2d at 369. Because the expert witness could not state that had the IUD been removed, the injury would not have occurred, the court said that the plaintiff had failed to establish the causal nexus between the defendants' negligence and the injury. *Id.*

Talley cites *Kosberg, supra,* to support her contention that she established her *prima facie* case. In *Kosberg*, a conflict in the testimony of the plaintiff's experts on causation was not enough to keep the case from the jury. 129 U.S.App.D.C. at 324–25, 394 F.2d at 949–50. However, the *Kosberg* court, citing *Quick, supra,* recognized that inconsistent testimony on causation may render the whole testimony inconclusive, thus requiring the entry of a directed verdict. 129 U.S.App. D.C. at 324, 394 F.2d at 949. *Quick* was a medical malpractice negligence action in which the trial court order directing a verdict against the plaintiff at the close of the plaintiff's evidence was affirmed. The plaintiff's expert witness had testified that the physician's treatment, allegedly using unsterile instruments, caused the plaintiff's septicemia, and that the infectious organism could have been, and most likely was, introduced into

---

PROSSER AND KEETON ON THE LAW OF TORTS 40 (5th ed. 1984).

5. For example, when asked to give his opinion as to the probable cause of Talley's injury, Dr. Hoffer said the cause was the ablative dose [150 mCi] "even though [the injury is] a rare phenomena. I think it has been shown ... that rare phenomena increases in probability as the dose gets higher...."

the plaintiff's body during the treatment. 110 U.S.App.D.C. at 171, 290 F.2d at 362. Taken by itself, the court said, this testimony might give the impression that the organism was in fact introduced by unsterile instruments. But the court looked at the full context and further statements of the expert witness, and concluded that his evidence showed that the treatment itself was inherently capable of producing the infection. The court held that there was no basis in the record to warrant an inference that the infection followed treatment only if there was negligence. 110 U.S.App.D.C. at 172, 290 F.2d at 363.

Similarly, Talley's evidence showed that I-131 treatment was inherently capable of producing at least temporary loss of taste. Dr. Hoffer testified that temporary loss of taste was known to occur at lower doses, and that he had read an article documenting permanent loss of taste at a dose of 10 mCi—one fifteenth the dose that Mrs. Talley received. In addition, Dr. Varma testified, as an adverse witness for Talley, that temporary taste loss was known to occur at lower doses, and that in his experience, temporary loss of taste occurs in about twenty percent of I-131 patients. In sum, viewed in the light most favorable to Talley, see *Bauman v. Sragow*, 308 A.2d 243, 244 (D.C.1973), Talley's evidence failed to establish that Varma's alleged deviation from the standard of care caused the injuries suffered. Therefore, the trial court did not err in granting the motion for directed verdict.

### III. Awarding of Costs

Following the trial, Varma filed a motion for allowance of costs totalling $38,528.11, including $26,082.47 in expert witness fees, $2,643.29 in deposition fees, and $6,351.29 for duplication, photocopying, photographs, and medical record service fees.[6] Varma submitted what he asserted was a "fully delineated" schedule of costs, which was actually comprised of lists of rather generic charge items coupled with dates and monetary amounts.[7] The parties submitted detailed memoranda in support of, and in opposition to, Varma's motion for allowance of costs.

In their appeals both parties contend that the trial judge committed error in her award of costs to Varma pursuant to the provisions of Super.Ct.Civ.R. 54(d) and 54–I.[8] Neither party takes issue with the trial court's threshold determination that an award of costs to Varma is appropriate. However, Talley argues that the trial judge erred by not denying Varma's motion for allowance of costs, in its entirety, because Varma failed to provide sufficient detail as to each claimed expense and failed to specify why the claimed expenses were necessary for preparation or trial of the case. In the alternative, Talley argues that the court erred in its award with respect to certain items or categories of costs.[9] Varma contends that he is entitled to recover as costs all or nearly all of the expenses he requested.[10]

---

**6.** Varma also sought: $681.69 for court filing fees, service of process, courier and messenger fees; $807.50 for fact witness and custodian of record fees; $476 for telephone and facsimile fees; $233.82 for postage; and $1,313.91 for travel.

**7.** For example, "Duplicating costs, [no date], $1,795.05; Duplicating costs, 12/31/94, $770.40.... Fact witness fee # 2562, 4/26/62, $42.50; Medical records # 2622, 6/5/95, $42.50."

**8.** Super.Ct.Civ.R. 54(d)(1) provides that "costs ... shall be allowed as a matter of course to the prevailing party unless the Court otherwise directs...." Super.Ct.Civ.R. 54–I(a) specifically provides that witness fees shall not be taxed or recovered as costs unless proof of the attendance of witnesses, by certificate of the attorney of record, is served upon the opposing party or counsel and filed within five days after the entry

of judgment or final order. Super.Ct.Civ.R. 54–I(b) specifically provides that the costs of depositions, reporters' transcripts on appeal, and premiums on bonds may be taxed at the discretion of the trial court.

**9.** Generally, Talley contends that Varma either failed to allege, or failed to show, that particular charges were necessary. Talley also contends that certain items are inaccurately documented, and that it cannot be ascertained from Varma's sparse documentation whether the fees for depositions include depositions Talley has already paid for.

**10.** Varma does not contest the trial court's denial of costs for courier and messenger fees, and does not specifically contest the denial of travel, postage, telephone and facsimile fees.

The trial court issued an order taxing $3,659.29 in costs to Talley, including $255 in expert witness fees, $500 for copies and duplication fees, $260 for court filing fees, and the full amount, $2,643.29, that Varma requested for deposition fees. Because Varma did not provide any information about what was copied, how many pages were copied, the cost per page, or the reason the copies were necessary for trial, the trial court denied most of Varma's request for duplication and photocopying. However, the trial court allowed $500 in recognition that some copying was necessary to provide courtesy copies and to have exhibits for trial. The trial court declined to charge Talley with expert witness fees in excess of the statutory per diem allowed for witnesses by 28 U.S.C. § 1821 or with witness fees for witnesses who appeared for depositions, but ordered payment at the statutory rate for the six witnesses whose attendance at trial was certified as required by Super.Ct.Civ.R. 54–I(a). Finally, the trial court allowed all of Varma's requested deposition costs because it was satisfied that the depositions were necessary for preparation of the case.

"The award of costs to the prevailing party under Super.Ct.Civ.R. 54(d) is 'within the trial court's discretion and may only be overturned upon our finding that the exercise of such discretion was an abuse.'" *Kleiman v. Aetna Cas. & Sur. Co.*, 581 A.2d 1263, 1267 (D.C.1990) (quoting *Ingber v. Ross*, 479 A.2d 1256, 1265 (D.C.1984)). The trial court's discretion lies in whether or not to award as costs items specifically authorized by 28 U.S.C. § 1920 (1994) or by other statutes (or court rule). *See Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 442–45, 107 S.Ct. 2494, 2497–99, 96 L.Ed.2d 385 (1987) (interpreting FED.R.CIV.P. 54(d), the federal counterpart to Super.Ct.Civ.R. 54(d)). An appellant contesting an award of costs "bears the burden of convincing this court on appeal that the trial court erred. . . . [and] the burden is even greater when the standard of review is abuse of discretion." *Robinson v. Howard Univ.*, 455 A.2d 1363, 1370 (D.C.1983). The Superior Court Civil Rules do not explicitly define what constitutes "costs," but we have stated that

[c]osts [are understood in the law] . . . to mean something less than a litigant's total expenses in connection with the suit. Court fees and witness fees ordinarily are recoverable but, absent unusual circumstances, the parties must bear their personal expenses. . . . The authority of a court to assess a particular item as costs is partly a matter of statute (or court rule), and partly a matter of custom, practice, and usage.

*Id.* at 1368–69 (citations omitted). Costs which have been paid to the Clerk and entered on the docket are ordinarily allowed as a matter of course, but other costs, such as witness fees and costs of depositions must be taxed specially by the court. *Id.; Panos v. Nefflen*, 205 A.2d 600, 601–02 (D.C.1964).

In a well-reasoned opinion, *Burns v. Greater Southeast Community Hosp.*, 119 Daily Wash.L.Rptr. 1869 (D.C.Super.Ct. July 11, 1991), Judge Richard A. Levie of the Superior Court reviewed the District of Columbia rules, custom, practice and usage, as well as the federal statutes applicable to allowance of costs. Many of the same types of costs that were at issue in *Burns* are contested here by Talley and Varma: court fees and copying costs, witness fees, deposition costs, and expert witness fees. We adopt the substance of Judge Levie's opinion to the extent that it deals with the issues presented in this case.

## A. Court Fees, and Duplication and Copying Costs

Applying *Burns* and our existing precedent to the dispute before us, we find no abuse of discretion in the trial court's allowance of court filing fees, which are allowed as a matter of course. *See Robinson, supra*, 455 A.2d at 1368; *Panos, supra*, 205 A.2d at 601–02. We likewise find no abuse of discretion in the trial court's allowance of only $500 for duplication and copying costs. As *Burns* explains, the prevailing party may recover the cost of obtaining and copying records and other material necessary for case preparation and presentation. *See* 119 Daily Wash.L.Rptr. at 1873. The trial court here denied most of the requests for copying expenses because Varma failed to establish

that all of the copies were necessary. Although Talley argues that the court should not allow any costs for copying in the absence of proof that the copying was necessary, we think the trial court's limited allowance of costs is well within its discretion where, as the trial court found here, some copying was obviously necessary to provide courtesy copies to the court, *see id.; see also* Super.Ct.Civ.R. 5(c), and for trial exhibits.

## B. Deposition Costs

■ The trial court taxed Talley for all of Varma's requested deposition costs. Super.Ct.Civ.R. 54–I(b) authorizes the discretionary taxing of such costs; our case law requires that the trial court find that the deposition was necessary for case preparation. *See Kleiman, supra*, 581 A.2d at 1267; *Bennett v. Kiggins*, 391 A.2d 236, 238 (D.C. 1978); *Burns, supra* 119 Daily Wash.L.Rptr. at 1874. Talley objects to the imposition of depositions costs on three grounds: first, Talley argues that deposition fees should be denied because Varma did not allege the depositions were necessary; second, Talley argues that costs should not be awarded for the expedited transcript of Dr. Hoffer's second deposition because, she maintains, the court abused its discretion in allowing the mid-trial deposition; and third, Talley claims she cannot ascertain why each fee was incurred and claims that she has already paid for depositions of three of the listed deponents.

■ With respect to Talley's first objection, the test is whether the deposition was necessary, not whether the requesting party alleges it was necessary. *See Kleiman, supra*, 581 A.2d at 1267; *Burns, supra*, 119 Daily Wash.L.Rptr. at 1874. The trial judge here made the required finding of necessity, and in any case, Varma did at least generally allege that the depositions were necessary to his case. Second, the mid-trial deposition of Dr. Hoffer was ordered by the trial judge when Dr. Hoffer offered opinions at trial that differed from those expressed in his previous deposition. Under these circumstances, we cannot say the trial judge abused her discretion in ordering the deposition or allowing costs for the expedited deposition transcripts.

Finally, absent a contrary showing by Talley, we assume the trial court fully considered the proposed costs for depositions. *See Robinson, supra*, 455 A.2d at 1370. Varma's itemization of deposition costs specifies the names of deponents and the dates that the depositions were taken. This should have been sufficient information to enable Talley to determine whether she had already paid these costs. Moreover, when Talley raised this issue in her opposition to Varma's motion for allowance of costs, she offered no proof that she had paid for the specific depositions she questions. Without an affirmative showing from Talley that error occurred, we cannot conclude that the trial judge abused her discretion. *See id.*

## C. Witness and Expert Witness Fees

Varma contests both the number of witnesses for which fees were allowed and the amount of each fee award, contending that the trial judge should have awarded witness fees for deposition witnesses in addition to trial witnesses, and that he is entitled to expert witness fees in excess of the statutory amount. We disagree.

■ The awarding of witness fees is controlled by Super.Ct.Civ.R. 54–I(a), which requires proof of the attendance of witnesses by certificate of the attorney of record. The certificate of witnesses' attendance filed by Varma's attorney listed only the six expert witnesses who appeared at trial. The trial judge allowed witness fees for each of those witnesses. The awarding of costs of depositions is provided for under Super.Ct.Civ.R. 54–I(b). The Rule makes no mention of expert witness fees for depositions, and we have been cited no case law in this jurisdiction awarding expert witness fees for depositions pursuant to Rule 54–I(b). *Accord Burns, supra*, 119 Daily Wash.L.Rptr. at 1874 & n. 13. Because such fees are not specifically authorized by statute and there is no precedent in this jurisdiction for awarding such fees, the trial judge did not abuse her discretion in declining to award them.

■ Varma also argues that he is entitled to expert witness fees in excess of the statutory amount, citing cases from the federal courts that were decided prior to 1987. Var-

ma correctly looks to the federal courts for guidance on this issue: as Judge Levie explained in *Burns, supra,* 119 Daily Wash. L.Rptr. at 1874, because we have not, until now, decided this issue, federal cases interpreting FED.R.CIV.P. 54 are persuasive when we interpret Super.Ct.Civ.R. 54. *See, e.g., Ingber, supra,* 479 A.2d at 1266 n. 13. In addition, various provisions of the D.C.Code dealing with witnesses incorporate 28 U.S.C. §§ 1821 and 1920. *See* D.C.Code §§ 11–743, 11–946, 15–714(b) (1995 Repl.). However, Varma is mistaken in asserting that the federal cases require the result he seeks. In 1987, the Supreme Court held in *Crawford Fitting Co., supra,* 482 U.S. at 441, 107 S.Ct. at 2497, that 28 U.S.C. § 1821(b) limits a court's authority to shift witness fees, as provided in 28 U.S.C. 1920(3), to the statutory amount in the absence of express legislation to the contrary. *Id.* at 439, 107 S.Ct. at 2496; *see also West Virginia Univ. Hosp., Inc. v. Casey,* 499 U.S. 83, 87, 111 S.Ct. 1138, 1141, 113 L.Ed.2d 68 (1991). We agree with Judge Levie that the federal statutory limit applies to expert witness fees provided for under Super.Ct.Civ.R. 54 and 54–I. *See Burns, supra,* 119 Daily Wash.L.Rptr. at 1874 and n. 11. Therefore we hold that the trial court did not err in limiting the allowance for expert witness fees to the current federal statutory per diem amount.

For the reasons stated, the judgments in all four appeals are

*Affirmed.*