David R. CORMIER, et al., Appellants,

v.

DISTRICT OF COLUMBIA WATER
AND SEWER AUTHORITY,
Appellee.

Nos. 11–CV–1290, 12–CV–537.

District of Columbia Court of Appeals.

Argued Dec. 19, 2012.
Decided July 3, 2013.

Peter T. Enslein, Washington, DC, with whom Kenneth D. Bynum, Alexandria, VA, was on the brief, for appellants.

James B. Slaughter, with whom Nadira Clarke, Katherine E. Wesley, and Nat N. Polito, Washington, DC, were on the brief, for appellee.

Before GLICKMAN and BLACKBURNE–RIGSBY, Associate Judges, and NEBEKER, Senior Judge.

GLICKMAN, Associate Judge:

David R. Cormier and certain limited liability entities in which he is a principal (collectively, "appellants"), own five residential apartment buildings in Northwest, Washington, D. C.: Florida House (located at 19th Street); Taylor Apartments (4027 13th Street); Ontario Apartments (2920 Ontario Road); and the Emerson Gardens Apartments (comprising two buildings located at 1325 and 1327 Emerson Street). Appellants brought this damages action against the District of Columbia Water and Sewer Authority ("WASA"), alleging that WASA delivered excessively corrosive water that caused "pinhole" leaks to develop in the buildings' aging copper piping, necessitating replacement of the piping in its entirety. The case eventually proceeded to trial before the court without a jury on three causes of action: negligence, strict liability, and breach of the Uniform Commercial Code's implied warranty of merchantability.[1] The present appeals are from the court's judgment on the merits in favor of WASA and its post-judgment allowance of costs. Essentially for reasons stated by the trial court, we now affirm.

## I. Background

WASA buys treated Potomac River water from the Washington Aqueduct and delivers this water to the District's residents through a 1,300–mile network of transmission lines, water mains, pumping stations, storage tanks, and service lines it operates and maintains. Appellants' central claim, disputed by WASA at trial, was that elevated aluminum and pH levels in the water "resulting from deficiencies in [WASA's] distribution system,"[2] in combination with high levels of chlorine (added to the water periodically to reduce bacteria), rendered the water excessively corrosive and thereby caused extensive leaks in the plumbing of appellants' apartment buildings. Each side presented a duly qualified expert to testify about the prevalence and cause of the leaks.

Appellants' expert, Dr. Marc Edwards, previously had investigated plumbing leaks reported by Maryland customers of the Washington Suburban Sanitary Commission ("WSSC"). After examining water and pipe samples and conducting research, Dr. Edwards had concluded that the customers' pipes had developed "pinhole leaks"[3] due to the combination of three factors: (1) high chlorine levels in the water, (2) high aluminum levels, and (3) high water pH.[4]

---

1. Earlier, in *Cormier v. District of Columbia Water and Sewer Authority*, 959 A.2d 658 (D.C.2008), this court reversed, in part, a grant of summary judgment for WASA.

2. Brief for Appellant at 9.

3. Dr. Edwards explained that a pinhole leak develops when non-uniform (or "pitting") corrosion becomes so severe it creates a small hole in the pipe. A copper pipe may suffer extensive pitting corrosion but have no pinhole leaks. Pinhole leaks can develop in as little as two weeks, but they can also take many decades to develop. While the development of pinhole leaks can be slowed by the addition of chemicals such as orthophosphate, once copper pitting has begun, it cannot be stopped entirely.

4. On the other hand, as the trial court noted, Dr. Edwards had answered a WSSC customer inquiry about the cause of pitting corrosion in copper pipes by saying that "[w]hen immersed in water, all commercially available metal pipe materials [specifically including copper pipes] will corrode," and that the reason was not known:

> There are many ideas on this subject. The list includes factors arising from improper installation, bacteria, electrical grounding, pipe manufacture, water quality, or a combination of these and other factors. While some individuals may strongly believe that one or more of these factors is involved, to date scientists have been unable to identify a cause. In fact, over the years, most of the promising ideas have been directly tested in

In 2003, Dr. Edwards visited four of the five buildings at issue in this case,[5] observed pinhole leaks in the piping, and measured high levels of chlorine, aluminum, and pH in the water samples he collected. Dr. Edwards attributed the high aluminum and pH levels, in part, to seepage of aluminum and lime from pipes that were "cleaned and lined" decades ago with concrete to reduce corrosion. He posited that the seepage occurred because the concrete had not been allowed to set fully before water began coursing through the pipes. Based on his findings, Dr. Edwards concluded that the synergistic combination of the elevated chlorine, aluminum and pH levels was responsible for the vast majority of the pinhole leaks in Cormier's buildings, just as in the case of the buildings owned by WSSC's customers. Dr. Edwards testified that he confirmed this conclusion in 2004 by performing a "pipe loop test" of water supplied by WASA to Florida House. After running this water through a sample of copper pipe at his laboratory continuously for four months, he found that a pinhole leak had developed.

Five years later in 2008, Dr. Edwards revisited Florida House, Taylor Apartments, and Ontario Apartments.[6] He again found pinhole leaks and took samples of the leaking pipes. After studying the samples, Dr. Edwards concluded that the buildings' copper plumbing had been irreversibly compromised and needed to be replaced in the near future.[7] Cormier testified that leaks have continued to develop since Dr. Edwards's 2008 visit.

WASA and its principal expert, Dr. Steven Reiber, disagreed with Dr. Edwards on almost every significant point. Among other things, WASA and Dr. Reiber disputed Dr. Edwards's theory that WASA's "clean and line" program had led to higher concentrations of aluminum in the water and a higher pH. In fact, Dr. Reiber testified, WASA had "relined [only] approximately 35 to 40 miles of major distribution mains . . . out of a total of some 1300 miles of pipe"; appellants' buildings were not served by those mains; and the cleaning and lining occurred so far in the past that any seepage from the concrete would have long since ceased. WASA also disputed Dr. Edwards's claim that the chlorine, alu-

---

my university laboratory, and none have caused a pit to form. Obviously, there is a cause, because pitting does occur—the problem is that the very unusual circumstances that cause this have not yet been scientifically identified.

Appellants claimed that Dr. Edwards wrote this answer before he conducted his research for WSSC, but at the time of trial, the answer was still on WSSC's website in the "frequently asked questions" section.

5. He did not visit the Emerson Gardens building at 1327 Emerson Street.

6. Dr. Edwards did not visit either of the Emerson Gardens buildings.

7. However, Dr. Edwards had responded as follows on the WSSC website to the frequently asked question, "[i]f I have pitting corrosion, does that mean I will have more?"

No. There are many cases where only one leak from pitting corrosion has occurred, the affected pipe section has been replaced, and that is the end of the problem. On the other hand, if you have had one pitting failure, you are statistically more likely to have another.

Asked whether replacing copper piping would avoid future problems, Dr. Edwards wrote:

Replacing all your pipes will buy you a few months to a year during which new pinhole failures will not occur. It might even solve the problem for a much greater time period; however, in my experience with other 'outbreaks' of pinhole leaks (outside of WSSC service area), it has not provided a long-term solution. Your own decision to replace plumbing should weigh the costs for your particular situation versus these possible benefits.

minum, and pH levels were elevated in the water supplied to appellants' buildings. Its own measurements (the accuracy of which appellants denied) indicated they were not.

Dr. Reiber further testified that chlorine and aluminum, either alone or in combination, had not been shown to cause pitting or pinhole leaks in copper plumbing. He identified the principal causes of pitting in copper piping as including poor workmanship; erosion corrosion, which occurs when water flows at excessively high velocities; crevice corrosion, which occurs when joints are improperly soldered together; and concentration cell corrosion, which occurs when sediment and/or bacteria accumulate, leading to a non-uniform corrosion process that results in broad, shallow pitting that develops over decades. After examining pipe samples from three of appellants'

buildings (Taylor Apartments, Ontario Apartments, and Florida House), Dr. Reiber concluded that there was only minimal pitting present and that this pitting was caused by concentration cell corrosion. Because the plumbing in the buildings was several decades old, Dr. Reiber explained, it was not unusual to find some leaks due to such corrosion.

In awarding judgment to WASA, the trial court found, among other things, that appellants had failed to prove the existence of any pinhole leaks at the Emerson Gardens Apartments or that WASA had caused the pinhole leaks at the other three properties.[8]

## II.  The Merits Appeal

■ Appellants seek reversal on multiple grounds.[9] They argue that the trial

---

8.  With respect to appellants' negligence claim, the court further found that appellants had been "unable to establish a national standard of care ... regarding the prevention of pinhole leaks in the water pipes that carry potable water within the residence of DC WASA customers"; that "there was no evidence [WASA had] breached any standard of care for a water utility"; and that appellants had not proved their claimed future damages with reasonable certainty. Regarding the strict liability count, the court also concluded that the water supplied by WASA was not "unreasonably dangerous" because it was "safe for its intended, ordinary purpose [consumption]." Similarly, finding that "all types of pipe, including galvanized steel, copper, or plastic, can experience leaks from water, which is a naturally corrosive substance," the court concluded as to the implied warranty of merchantability claim that appellant had not shown that WASA "improperly packaged the water when it sold and distributed the water through its pipe system."

Because, as we discuss below, we uphold the court's conclusion with respect to causation, we need not address these alternative grounds on which the court based its decision.

9.  Preliminarily, appellants complain that the court's findings of fact and conclusions of law

did not comply with Civil Rule 52(a). We do not agree. In pertinent part, the Rule requires the trial court to "state findings of fact specially and state separately its conclusions of law in every action tried upon the facts without a jury.... Such findings of fact and conclusions of law ... shall be sufficient if they state the controlling factual and legal grounds of decision." Super. Ct. Civ. R. 52(a). In other words, Rule 52(a) simply requires the trial court to "state sufficient findings of fact and conclusions of law to permit meaningful appellate review." *Concord Enters. v. Binder*, 710 A.2d 219, 224 (D.C.1998). Consequently, "a deficiency in factual findings does not always constitute reversible error. We will uphold the trial court's ruling against such a challenge, for example, where the record clearly reflects the grounds of the trial court's decision or where the trial court's decision is clearly supported by the record." *Wright v. Hodges*, 681 A.2d 1102, 1105 (D.C.1996) (internal quotation marks and citations omitted). *See also id.* at 1105 (stating that the court of appeals has "[o]ften sustained rulings of the trial court on the basis of implied findings" (internal quotation marks omitted)).

Appellants contend that, "in its findings of fact, the trial court did little to weigh[ ] the

court erred (1) when it excluded expert testimony regarding the cause of pinhole leaks at a site two blocks from one of appellants' buildings; (2) in rejecting appellants' claims related to Emerson Gardens Apartments based on a lack of evidence of pinhole leaks at that property; and (3) in rejecting appellants' negligence, strict liability, and implied warranty of merchantability claims for lack of proof of causation and on other grounds. We address each of these claims below.

## A. Exclusion of Evidence

■ To help prove that the pinhole leaks at appellants' buildings were caused by WASA's alleged provision of excessively corrosive water, appellants sought to show that another building, the DeBell residence located two blocks away from Florida House at 1702 19th Street, N.W., also had developed pinhole leaks in its copper plumbing. Appellants argued that this evidence would prove their theory of causation because, according to Dr. Edwards, "[t]he water that flows into Florida House comes from the same main that provides water to the DeBell home," and "[b]oth buildings have had pinhole leaks ... [and] new pinhole leaks continue to form." [10] In contrast, Dr. Reiber testified that he had examined numerous samples of copper pipe from the DeBell property and concluded that: (1) poor joint fabrication had caused some erosion corrosion in both the cold and hot water pipes; (2) "no corrosion related leakage (tubing perforation) could be identified on the cold water tubing"; and (3) the erosion corrosion leaks that had developed on the hot water pipes resulted from poor joint fabrication and were unrelated to water quality. He also testified that the conditions he had observed were mild and would not substantially reduce the remaining service life of the pipes. After considering Dr. Edwards and Dr. Reiber's deposition testimony, the trial court granted WASA's motion *in limine* to exclude evidence of leaks at the DeBell residence, ruling that the evidence "certainly does not prove that the defendants [sic] delivered corrosive water to plaintiff's [sic] property."

■ "We review a trial court's decision about admissibility of evidence for abuse of discretion." [11] While "[t]he test for relevance is not a particularly stringent one," [12] the evidence of pinhole leaks at the DeBell residence was minimally probative at best. That another building in the vicinity happened to have had pinhole leaks may be consistent with appellant's theory of causation, but it does little to prove that theory—particularly inasmuch as the cause of the leaks at the DeBell property was itself in dispute and uncertain. As Dr. Reiber opined, the leaks there could have been caused by factors unique to that residence (namely, poor joint fabrication) and

---

conflicting evidence, or resolve the factual disputes" and "made no effort to consider the demeanor of the witnesses." Brief for Appellants at 45 (internal quotation marks omitted). While the court might have made more detailed or explicit findings and explained its reasoning more clearly or at greater length, we are satisfied that its findings state the controlling grounds of the court's decision, are supported by the record, and are sufficiently clear and comprehensive to permit meaningful appellate review.

10. Brief for Appellants at 22–23.

11. *Stone v. Alexander*, 6 A.3d 847, 851 (D.C. 2010) (quoting *Hammond v. United States*, 880 A.2d 1066, 1095 (D.C.2005)).

12. *Busey v. United States*, 747 A.2d 1153, 1165 (D.C.2000); *see also id.* ("Relevant evidence is simply that which tends to make the existence or nonexistence of a [contested] fact more or less probable than it would be without the evidence." (internal quotation marks omitted)).

by other conditions unrelated to WASA's distribution system. Given the minimal probative value of the evidence, the trial court cannot be said to have abused its discretion in excluding Dr. Edwards's testimony regarding the leaks at the DeBell residence and his opinion as to their cause. "The trial court 'has a duty to exclude confusing and distracting evidence on collateral issues.'"[13] Even assuming Dr. Edwards's testimony should have been admitted, we are confident the error had no impact on the trial's outcome.

### B. Sufficiency of Evidence

■ "In review of [a] bench trial, we may not set aside the judgment except for errors of law 'unless it appears that the judgment is plainly wrong or without evidence to support it.'"[14] "Even where we find error, 'we may find that the fact of error in the trial court's determination caused no significant prejudice and hold, therefore, that reversal is not required.'"[15]

### 1. Emerson Gardens Apartments

■ George Thibodeau, a general partner with Cormier and the property manager of Emerson Gardens Apartments, testified that since Cormier and he purchased the buildings in 1985, he could remember only one instance in which a leaking cop-

per pipe had to be replaced there. That repair was necessary, he explained, because the copper pipe had been touching an iron pipe. Both Thibodeau and Solomon Dennis, the on-site property manager, denied that pipe leaks were a problem at Emerson Gardens or that the pipes needed to be replaced. The trial court relied on their testimony in concluding that appellants had not shown there were any pinhole leaks there and, hence, that appellants had not met their burden of proving damages at Emerson Gardens.

Appellants argue that the court overlooked testimony from Dr. Edwards and Cormier that they found pinhole leaks at 1325 Emerson Street in 2003 and that Dr. Edwards found a pinhole leak in one sample of copper pipe that Cormier had removed from the building at 1327 Emerson Street.[16] Even so, we cannot say that the court clearly erred in discounting that testimony and relying instead on the testimony of the property's co-owner and property managers[17] to find that appellants had not proved that the plumbing in Emerson Gardens had developed pinhole leaks. Moreover, even if we were to conclude that the court overstated the matter slightly in finding no proof of *any* pinhole leaks at Emerson Gardens, we would deem the error inconsequential and harmless. The mere finding of one or a few pinhole leaks

13. *Cannon v. United States*, 838 A.2d 293, 299 (D.C.2003) (quoting *Carr v. United States*, 585 A.2d 158, 163 (D.C.1991)).

14. *Estate of Kurstin v. Lordan*, 25 A.3d 54, 68 (D.C.2011) (quoting *Hinton v. Sealander Brokerage Co.*, 917 A.2d 95, 101 (D.C.2007)).

15. *Stone*, 6 A.3d at 851 (quoting *Johnson v. United States*, 398 A.2d 354, 366 (D.C.1979)).

16. This was the only pinhole leak sample Cormier ever obtained from either building at Emerson Gardens Apartments. This sample was mislaid and lost prior to trial by WASA's

counsel, with whom it had been left after Dr. Edwards had examined it and written a report documenting his findings. We are not persuaded that appellants were prejudiced by the subsequent loss of the sample or that the court abused its discretion in declining to sanction WASA for spoliation.

17. *See Stroman v. United States*, 878 A.2d 1241, 1244 (D.C.2005) ("Any factual finding anchored in credibility assessments derived from personal observations of the witnesses is beyond appellate reversal unless those factual findings are clearly erroneous." (internal quotation marks omitted)).

in two buildings proves virtually nothing and certainly does not establish the extensive damage (or impending damage [18]) to the buildings' plumbing that appellants claimed. Nor does the evidence alter our conclusion regarding causation, to which we now turn.

## 2. Causation

██ The trial court found that appellants "produced sufficient evidence to show that there were indeed pinhole leaks found in copper pipes in each of the three remaining properties, Florida House, Taylor Apartments, and Ontario [Apartments]" (though the court noted that "only a minimal number" of such leaks had been shown). But to succeed on any of their causes of action—negligence, strict liability, or breach of implied warranty of merchantability—with respect to these buildings (as also with respect to Emerson Gardens), appellants needed to prove, *inter alia*, that WASA *caused* the pinholes by supplying excessively corrosive water.[19] The trial court was unpersuaded by appellants' evidence of causation. It held that appellants

failed to show, by a preponderance of the evidence that DC WASA's action caused the pinhole leaks at the properties. The undisputed evidence at trial was that the Washington Aqueduct cleans and treats the water so that it comports with federal regulations. The evidence also showed that there are a variety of things that can cause a pinhole leak to develop and that these alternatives cannot be solely attributed to DC WASA. Plaintiffs' expert posited that DC WASA's clean-and-line program could have contributed to the increased chlorine and aluminum levels in the water. However, in light of the other causes of pinhole leaks, the Court is not convinced that Plaintiffs have proven, by a preponderance of the evidence, that the DC WASA's practices caused the water to be excessively corrosive.[20]

Appellants contend the court erroneously based its ruling on a finding that WASA's conduct was not the *sole* cause of their injuries, whereas the correct test of legal causation is whether WASA's (putative) delivery of excessively corrosive water was "a substantial factor in bringing about the harm."[21] We think this argu-

---

18. *Cf.* note 6, *supra.*

19. *See Hill v. Metro. African Methodist Episcopal Church,* 779 A.2d 906, 908 (D.C.2001) ("The plaintiff in a negligence action bears the burden of proof on three issues: the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury." (internal quotation marks omitted)); *Word v. Potomac Elec. Power Co.,* 742 A.2d 452, 459–460 (D.C.1999) ("To prevail on a claim for strict liability in tort under § 402A [of Restatement (Second) of Torts], the plaintiff must prove the [product] defect was a direct and proximate cause of the plaintiffs [sic] injuries." (internal quotation marks omitted)); *Payne v. Soft Sheen Products, Inc.* 486 A.2d 712, 720 (D.C.1985) (explaining that under the doctrine of implied warranty, as under strict liability in tort, liability is im-

posed for "injury caused" by a defective product (internal quotation marks omitted)).

20. At this point in its decision, the court referenced Dr. Edwards's responses to frequently asked questions on WSSC's website. As previously noted in note 3, *supra,* Dr. Edwards acknowledged that the cause of pinhole leaks in copper pipes was unknown and that water quality was only one of a number of suspected causes.

21. *See, e.g., Claytor v. Owens–Corning Fiberglas Corp.,* 662 A.2d 1374, 1381–82 (D.C.1995) ("The actor's negligent conduct is a legal cause of harm to another if: (a) his conduct is a *substantial factor* in bringing about the harm, and (b) there is no rule of law relieving the actor from liability because of the manner in which his negligence has resulted in the harm." (quoting Restatement (Second) of Torts § 431 (1965))).

ment misapprehends the court's reasoning: We do not read the passage we have quoted as evincing a failure by the court to apply the "substantial factor" test of legal causation. Rather, "in light of the other causes of pinhole leaks" (not attributable to WASA), the court simply was not persuaded by a preponderance of the evidence that WASA had "caused the water to be excessively corrosive," i.e., that it bore *any* responsibility for the leaks. WASA's actions or inactions, therefore, could not have been a substantial factor—or even a factor at all—in causing the pinhole leaks in appellants' properties. The trial record provided ample support for the court's determination with respect to causation: Briefly put, (1) the expert witnesses agreed that water is a naturally corrosive substance and that pinhole leaks have numerous causes other than the quality of the water, and (2) Dr. Reiber disputed both appellants' contention that the water delivered by WASA contained elevated chlorine, aluminum, and pH levels and appellants' attribution of the leaks to this water. The trial court's finding that causation had not been proved was not clearly erroneous.

### III. The Costs Appeal

After prevailing at trial, WASA filed a motion for allowance of costs pursuant to Civil Rule 54(d).[22] It requested an award of $76,434.40 for various litigation expenses it had incurred. The trial court cut the request substantially and ultimately awarded WASA a total of $23,714.25 in costs. Appellants challenge the award of $13,312.11 for deposition transcripts, $2,599.34 for copying costs, and $1,859.06 in travel costs (that were associated, mainly, with defense counsel's attendance at an out-of-state *de bene esse* deposition). Appellants also argue that the court erred in failing to penalize WASA for "overreaching" in its motion for allowance of costs (i.e., for asking for so much more than the court ultimately found to be allowable).

We are not persuaded that the court abused its discretion[23] with respect to the deposition transcripts and document copying expenses, which it found to be reasonable in light of the complexities of the litigation.[24] The court carefully scrutinized these costs, as shown by the fact that it refused to award the bulk of the $20,959.69 in copying costs that WASA requested on the ground that they either were not substantiated or were not shown to be reasonable or necessary.[25] Given the court's restraint in awarding costs and detailed explanation of why it awarded some

22. Superior Court Civil Rule 54(d)(1) provides, in pertinent part, that "[e]xcept when express provision therefor is made either in an applicable statute or in these Rules, costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the Court otherwise directs...."

23. *See Coulter v. Gerald Family Care, P.C.*, 964 A.2d 170, 203 (D.C.2009).

24. "[D]eposition costs are specifically delineated as taxable at the court's discretion under Super. Ct. Civ. R. 54–I," as long as the court finds that the depositions were "necessary for case preparation." *Nicola v. Washington Times Corp.*, 947 A.2d 1164, 1176 (D.C.

2008) (internal quotation marks omitted). Similarly, "the prevailing party may recover the cost of obtaining and copying records and other material necessary for case preparation and presentation." *Talley v. Varma*, 689 A.2d 547, 555 (D.C.1997); *see also* 28 U.S.C. § 1920(4) (Supp.2011) (taxable "costs" include "the costs of making copies of any materials where the copies are necessarily obtained for use in the case").

25. Recognizing that some copying was necessary, the court followed the approach we upheld in *Talley* and awarded WASA a small fraction of its request. *See* 689 A.2d at 555–56.

costs but not others, appellants have not borne the considerable burden of demonstrating that discretion was abused in these areas. Appellants argue that the court erred by merely finding the expenditures reasonable in light of the complexities of the case without finding that they were necessary for case preparation, but that argument is little more than playing with words. We have no doubt that the court found the expenditures necessary for case preparation *because* the complexities of the case made them reasonable.

■■■■■ On the other hand, we conclude that the attorney travel expense was not an allowable "cost" within the meaning of Civil Rule 54(d). The Rule is substantially identical to its federal counterpart, and we look to federal decisions interpreting Federal Rule of Civil Procedure 54(d) for guidance.[26] Historically, we have said that "[t]he authority of a court to assess a particular item as costs is partly a matter of statute (or court rule), and partly a matter of custom, practice, and usage."[27] However, in *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, the Supreme Court held that "[t]he discretion granted by [Federal] Rule 54(d) ... is solely a power to decline to tax, as costs, the items enumerated in [28 U.S.C.] § 1920."[28] In light of *Crawford*, we have recognized that the Superior Court's discretion to award costs to the prevailing party under Civil Rule 54(d) is limited to items "specifically authorized by 28 U.S.C. § 1920 ... or by other statutes (or court rule)."[29] The attorney travel costs in question here are not among the taxable costs enumerated in § 1920,[30] and we are directed to no other statute or court rule authorizing the trial court to tax the losing party with them; accordingly, Rule 54(d) does not authorize the taxation of these costs.[31]

**26.** *Coulter*, 964 A.2d at 204 n. 44.

**27.** *Robinson v. Howard Univ.*, 455 A.2d 1363, 1368–69 (D.C.1983) (footnote omitted).

**28.** 482 U.S. 437, 442, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987). 28 U.S.C. § 1920 (Supp. 2011) provides that:
A judge or clerk of any court of the United States may tax as costs the following:
(1) Fees of the clerk and marshal;
(2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;
(3) Fees and disbursements for printing and witnesses;
(4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;
(5) Docket fees under section 1923 of this title [28 USCS § 1923];
(6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title [28 USCS § 1828].

**29.** *Talley*, 689 A.2d at 555 (citing *Crawford*, 482 U.S. at 442–45, 107 S.Ct. 2494); *see also* *Upton v. Henderer*, 969 A.2d 252, 255 (D.C. 2009).

**30.** We note that we have ruled § 1920 was "necessarily incorporated" into our law by the District of Columbia Court Reorganization Act of 1970. *Dillard v. Yeldell*, 334 A.2d 578, 580 (D.C.1975); *see also Upton*, 969 A.2d at 255 (noting that "the court in *Talley v. Varma* ... and *Harris v. Sears Roebuck & Co.*, 695 A.2d 108 (D.C.1997), held that the federal statutory limits in 28 U.S.C. §§ 1821 and 1920 limit the expert witness fees awardable to a prevailing party under Super. Ct. R. Civ. P. 54 and 54–I.").

**31.** We appreciate that our "law concerning the [trial] court's discretion [in awarding costs] is not entirely clear in all particulars." *Harris v. Sears Roebuck & Co.*, 695 A.2d 108, 110 n. 1 (D.C.1997). In *Coulter*, for instance, the court "decline[d] to hold that the trial court abused its discretion in awarding" attorney transportation costs to the prevailing party in that case even though such costs were not "customarily taxable." 964 A.2d at 204 (internal quotation marks omitted). But because we recognized in *Talley* that the term "costs" in Rule 54(d) is limited to expenses

Finally, asserting that WASA "overreached" by seeking over $76 thousand in costs (more than three times what the trial court found to be awardable), appellants ask us to create a new rule of law punishing prevailing parties who "overreach[ ] by either denying the motion [for taxation of costs] *in toto* or substantially reducing any award that it makes." [32] We have never penalized a prevailing party merely for requesting more costs than ultimately were awarded,[33] and absent a showing of misconduct that has not been made here, we see no justification for doing so now.[34] Consequently, we hold that the trial court did not abuse its discretion in failing to punish WASA by denying otherwise allowable costs.

### IV. Conclusion

For the foregoing reasons, the judgment of the Superior Court is hereby affirmed. The award of costs is affirmed except insofar as we direct that the award be reduced by $1,859.06, representing WASA's attorney travel costs.

*It is so ordered.*

specified as taxable in an applicable statute or court rule and because there is no indication that *Crawford* was brought to the attention of the *Coulter* court, we cannot permit the award of attorney travel costs here. "Where a division of this court fails to adhere to earlier controlling authority, we are required to follow the earlier decision rather than the later one." *(Tony Christopher) Thomas v. United States,* 731 A.2d 415, 421 n. 6 (D.C. 1999).

**32.** Second Brief for Appellant at 7.

**33.** *See, e.g., Talley,* 689 A.2d at 550 (where the trial court denied 90.5% of costs but did not punish the prevailing party for overreaching).

**34.** The cases from other jurisdictions cited by appellants do not support the adoption of a new rule that punishes a prevailing party simply because that party requested substantially more costs than it was awarded. The cited cases generally deny costs because of the prevailing party's misconduct in the litigation or the losing party's inability to pay. *See, e.g., Congregation of the Passion, Holy Cross Province v. Touche, Ross & Co.,* 854 F.2d 219, 222 (7th Cir.1988) ("Generally, only misconduct by the prevailing party worthy of a penalty (for example, calling unnecessary witnesses, raising unnecessary issues, or otherwise unnecessarily prolonging the proceedings), or the losing party's inability to pay will suffice to justify denying costs.").