**Jacqueline E. STONE,
et al., Appellants,**

v.

**E. Pendleton ALEXANDER, Appellee.**

**No. 07–CV–355.**

District of Columbia Court of Appeals.

Argued Dec. 2, 2009.
Decided Oct. 28, 2010.

---

Catherine D. Bertram, with whom Victor E. Long, Washington, DC, was on the brief, for appellant.

Robert W. Goodson, with whom Deidre L. Robokos, Washington, DC, was on the brief, for appellee.

Before GLICKMAN, KRAMER and THOMPSON, Associate Judges.

KRAMER, Associate Judge:

In this malpractice case, Jacqueline and Ronald Stone sued Dr. E. Pendleton Alexander and Medical Faculty Associates ("MFA") in connection with the death of their mother, Irma Stone, after a double heart valve replacement operation performed by Dr. Alexander. A jury returned a verdict for appellee. The issues on appeal are whether the trial court properly concluded that a conversation between Dr. David Salter, an assisting surgeon, and his colleagues about Dr. Salter's concerns with respect to Dr. Alexander's performance during Ms. Stone's surgery was privileged,[1] and whether an "amended autopsy report" was properly admitted into evidence.[2] We hold that even if the trial court abused its discretion by excluding testimony regarding a particular conversation, appellants suffered no prejudice because the court allowed testimony about every other conversation that Dr. Salter had with his colleagues, which allowed the jury to properly consider the matter. We also find no merit to appellants' remaining assertions and thus affirm.

## I. Factual Background

On October 20, 2003, Irma Stone underwent a double heart valve replacement operation at George Washington University Hospital ("GWUH"). Ms. Stone was 67 years old and considered a "high-risk" patient because of her pre-existing afflictions,[3] but otherwise the operation was considered "routine." Eight days after the surgery, she was dead.[4] Appellants alleged that Dr. Alexander had negligently placed one of the replacement valves during the surgery, blocking the flow of blood to Ms. Stone's heart and causing her eventual death.

---

1. D.C.Code § 44–805(a)(1) (2001) states that "[t]he files, records, findings, opinions, recommendations, evaluations, and reports of a peer review body, information provided to or obtained by a peer review body, [and] the identity of persons providing information to a peer review body ... shall be neither discoverable nor admissible into evidence in any civil ... proceeding."

2. This issue is not properly before us. See note 4, *infra*.

3. Ms. Stone presented with a history of aortic and mitral valve insufficiency due to rheumatic heart disease, systemic lupus, hypertension and type II diabetes.

4. The preliminary autopsy report (which appellants received six months after Ms. Stone's death, indicated that Ms. Stone died from acute myocardial ischemia (presumed arrhythmia) and gave two reasons for why the arrhythmia occurred: (1) coronary artery obstruction and (2) aortic valve replacement. The final autopsy report gave the same cause of death, but listed "aortic valve replacement" as a "contributory" cause, along with six other systemic conditions that included a history

of aortic and mitral valve insufficiency due to rheumatic heart disease, systemic lupus, hypertension and type II diabetes. Both the preliminary and the final autopsy reports were admitted into evidence. Appellants' second issue presumably concerns the admission of the final autopsy report. But apart from listing the issue in their introduction, appellants have not developed it any further. Their discussion instead focuses on whether the trial testimony of Dr. Haudenschild, the author of the final autopsy report, should have been excluded. Where a party generally raises an issue on appeal without supporting argument, we deem it to be abandoned. *See generally Bardoff v. United States*, 628 A.2d 86, 90 n. 8 (D.C.1993) (citing D.C.App. R. 28(a)(5) which requires briefs to contain "contentions of the appellant with respect to the issues presented, and the reasons therefor[e], with citation to authorities, statutes and parts of the record relied on"). *See also Cratty v. United States*, 82 U.S.App. D.C. 236, 243, 163 F.2d 844, 851 (1947). Moreover, it appears that appellants themselves published the final autopsy report to the jury.

Dr. Alexander was assisted during the operation by Dr. Salter. The undisputed facts established at trial are as follows. Dr. Salter left the operating room some time during the procedure and returned later. Dr. Salter, and not Dr. Alexander, was present when Ms. Stone passed away. After Ms. Stone's death, Dr. Salter asked to examine her heart during the autopsy. Dr. Salter had discussions about the operation with his colleagues at various times, including Dr. George, a cardiothoracic fellow at GWUH, Dr. Gharagozloo, chief of cardiothoracic surgery at GWUH, and Dr. Katz. One of these conversations took place in the hospital cafeteria, during a meeting called by Dr. Gharagozloo. Dr. Alexander was not present.

The parties dispute why Dr. Salter left the operating room, why he went to examine Ms. Stone's heart at the autopsy, and what Dr. Salter said to his colleagues about the operation. Specifically, appellants assert that Dr. Salter's testimony at trial was inconsistent with the statements he made to his colleagues. At trial, Dr. Salter denied that Dr. Alexander had placed the valve negligently and offered an attenuated version of his concerns about the operation and Dr. Alexander's performance. On the other hand, at his deposition, Dr. Gharagozloo testified that Dr. Salter "voiced ... very strongly his opinion about the way a valve was placed." According to Dr. Gharagozloo, Dr. Salter told Dr. Alexander during the operation that "the valve they were putting in ... wasn't seating right, it wasn't being placed correctly." Dr. George's deposition testimony was that Dr. Salter had expressed concerns to him about the position of the replacement valve. Drs. George and Salter observed Ms. Stone's heart at the autopsy together, and Dr. George shared Dr. Salter's concerns at that time. Dr. George testified that the cafeteria meeting was called "out of concern for the position of

the valve," and that Dr. Salter repeated his concerns at the meeting. At Dr. Katz's deposition, he testified that the cafeteria meeting was held because "people were upset and concerned about Ms. Stone's death" and "Dr. Gharagozloo ... was made aware of this concern about the case, and there was enough talk that I think he simply wanted people to stop talking and say look, this is the way we handle it."

Appellee moved to preclude all testimony involving Dr. Gharagozloo, arguing that because Dr. Gharagozloo chaired GWUH's Peer Review Committee, "all conversations regarding the decedent's surgery [involving] Dr. Gharagozloo ... were properly subject to the peer review privilege." Despite calling it a "close question," the trial court partially granted the motion with regards to the meeting in the cafeteria. The court reasoned that the meeting was "the beginning of an attempt to formulate the [peer review] committee."

At the same time, the court allowed testimony regarding all other conversations Dr. Salter had with his colleagues, including those colleagues who had been present at the cafeteria meeting. For example, the jury received the bulk of Dr. Gharagozloo's testimony through his *de bene esse* deposition. Therefore, Dr. Gharagozloo's statement that one "could not talk to Dr. Salter without this matter coming up" was admitted. Also admitted were Dr. Gharagozloo's hearsay reports of Dr. Salter claiming that he voiced his concerns about the valve's placement to Dr. Alexander during the operation and Dr. Salter's conclusion that "the outcome of this situation [i.e., Ms. Stone's death] was due to the result of the valve placement." In addition, Dr. Katz testified at trial that Dr. Salter told him that he was concerned about the position of the valve during the operation, and that his examination of Ms. Stone's heart after her death confirmed his concerns that the valve was not correctly

positioned. Dr. Katz told the jury that Dr. Salter "told us that when he looked at the valve [after Ms. Stone's death], clearly the valve was in an improper position.... [T]here was some obstruction of the coronaries." Finally, the jury heard the *de bene esse* deposition testimony of Dr. George—who was also a participant at the cafeteria meeting, along with Drs. Gharagozloo and Katz—explaining that Dr. Salter expressed "concern that the valve was [positioned] too close to the [coronary] ostia such that it might inhibit the performance of the valve."

## II. Standard of Review

We review a trial court's decision about admissibility of evidence for abuse of discretion.[5] In exercising our reviewing power, we remain cognizant that "[t]he concept of 'exercise of discretion' is a review-restraining one. The appellate court role in reviewing 'the exercise of discretion' is supervisory in nature and deferential in attitude."[6] Even where we find error, "we may find that the fact of error in the trial court's determination caused no significant prejudice and hold, therefore, that reversal is not required."[7] "In sum, the appellate court makes two distinct classes of inquiries when reviewing a trial court's exercise of discretion. It must determine, first, whether the exercise of discretion was in error and, if so, whether the impact of that error requires reversal."[8]

## III. Legal Analysis

### A. The cafeteria meeting

Appellants claim that the exclusion of testimony regarding what was discussed during the cafeteria meeting "severely impede[d their] ability to introduce the full extent of the admissions against interest," despite the introduction of Dr. Salter's one-on-one conversations with several doctors, because "witnesses [found it difficult] to distinguish which statements were made in the cafeteria versus other parts of the hospital." Appellants assert that the informal meeting of doctors in a cafeteria "cannot fit within [the] definition of professional peer review," and that the witnesses should have been allowed to testify about the content of that conversation. Appellee, however, contends that the meeting falls within the plain language of the peer review statute. In the alternative, he argues that even if the trial court erred by concluding that the cafeteria conversation was privileged, appellants suffered no prejudice because the jury was exposed to Dr. Salter's views on the matter through testimony regarding Dr. Salter's numerous other conversations on the subject, covering substantively the same ground as the cafeteria meeting.

Appellants assert that the peer review privilege does not apply to "informal discussions among colleagues in the cafeteria [which are not] part of the recognized peer review process at the hospital." Appellee, on the other hand, points out that the plain language of the statute does not require that a meeting conform to a formal hospital process in order to be privileged.[9] Therefore, he asserts, "a meeting where multiple individual physicians were

---

**5.** *Hammond v. United States,* 880 A.2d 1066, 1095 (D.C.2005) (quoting *Plummer v. United States,* 813 A.2d 182, 188 (D.C.2002)); *see also Johnson v. United States,* 398 A.2d 354, 361–67 (D.C.1979) (explaining the legal concept of "discretion" in depth).

**6.** *Johnson, supra* note 5 at 362.

**7.** *Id.* at 366.

**8.** *Id.* at 367.

**9.** The District of Columbia defines "peer review" as, among other things, a "[r]eview of the qualifications, activities, conduct, or performance of any health professional" D.C.Code § 44–801(5)(E). The statute makes

specifically summoned ... to discuss their opinions [of a colleague's performance] is precisely the nature of the meetings [protected by the privilege]." We need not reach the merits of these arguments because we hold that appellants suffered no prejudice even if the trial court erred by withholding the cafeteria conversation from the jury.

Appellants' claim of error depends on their assertion that they were unable to present the jury with the full extent of Dr. Salter's pre-trial statements concerning his views of Dr. Alexander's performance because the trial judge prevented the witnesses from testifying about the cafeteria meeting. Therefore, they claim, they were unable to properly contrast his earlier views with the more attenuated testimony he provided at trial. This claim is without merit. The record indicates that the jury was presented with testimony from multiple witnesses who repeatedly described

Dr. Salter's pre-trial view that Dr. Alexander had not placed the valve properly. Any evidence provided by admission of the cafeteria discussion, which also focused on Dr. Salter's dissatisfaction with the operation, would have been cumulative. Even appellants concede the point that the cafeteria conversation did not involve any novel "admissions," stating that "the ruling impaired the weight of the testimony by giving the false impression that the admissions were not made repeatedly." [10]

■■ We will not reverse "a judgment upon a jury verdict for harmless error which has not been shown to have prejudiced substantial rights in the proceedings or the ultimate outcome of the trial." [11] Moreover, it is well-settled that exclusion of cumulative evidence does not require reversal absent a "manifest abuse of discretion." [12] We do not discern from the record that the weight of testimony re-

confidential "information provided to or obtained by a peer review body," *supra* note 1, which is explicitly and specifically defined as "a committee, board, hearing panel or officer, reviewing panel or officer or governing board of a health-care facility or agency...." D.C.Code § 44–801(6). Dr. Gharagozloo was the head of GWUH's Peer Review Committee at the time he called the cafeteria meeting. He was thus "an officer of a reviewing panel." The parties do not dispute that Dr. Gharagozloo called the meeting to review Dr. Alexander's conduct during Ms. Stone's operation. On the other hand, the statute uses the word "procedure" in generally referring to peer review. *Id.* § 44–801(5) (" 'Peer review' means the procedure by which health-care facilities ... monitor, evaluate, and take actions to improve the delivery, quality, and efficiency of services within their respective facilities ...."). The question, therefore, is how much "procedure" is required before the privilege is triggered. It seems clear that a chance meeting in a corridor would not constitute enough procedure to trigger the privilege. It seems equally clear that a formal meeting of the official peer review committee would be privileged. But the existing peer

review statute was passed " 'to expand, strengthen and clarify the immunity and confidentiality provisions' of the [previous] peer review statute," *Jackson v. Scott*, 667 A.2d 1365, 1368 (D.C.1995) (citing Report of the Committee on Consumer and Regulatory Affairs on Bill 9–355, The "Health Care Peer Review Act of 1992," at 3 (October 27, 1992)), and extends to meetings other than a formal committee meeting by its plain terms, so it cannot be read too narrowly to only apply to formal meetings of a review committee.

10. But the record shows that the jury was aware that Salter's admissions were made repeatedly. See Dr. Gharagozloo's testimony, *supra*. "One could not talk to Dr. Salter without this matter coming up."

11. *Sullivan v. Yellow Cab Co.*, 212 A.2d 616, 618 (D.C.1965).

12. *E.g.*, *Mandes v. Midgett*, 49 App. D.C. 139, 140–41, 261 F. 1019, 1020–21 (1919) (refusing to grant a new trial where newly discovered evidence was "largely cumulative of evidence adduced at the trial and passed upon by the jury").

garding Dr. Salter's admissions was materially impaired by the exclusion of the admissions made during the cafeteria meeting. Thus, we hold that the judge's ruling does not constitute a "manifest abuse of discretion." [13]

### B. Dr. Haudenschild's testimony

■ Additionally, appellants argue that Dr. Haudenschild's *de bene esse* video deposition testimony should have been excluded because (1) it is hearsay and (2) appellee did not disclose Dr. Haudenschild as a witness in a timely manner. Appellants do not explain why Dr. Haudenschild's testimony is hearsay. In fact, they fail to develop this argument any further than listing it in a section heading. Therefore, the argument is not properly before us and we decline to address it. [14]

Appellants also claim that appellees failed to disclose Dr. Haudenschild as a witness as required by Rule 26(b)(4).

Rule 26(b)(4) requires that a party who intends to rely on expert opinions must provide the opposing party with the substance of the expert's expected testimony before trial .... Rule 26(b)(4) applies only to facts and opinions acquired or developed in anticipation of litigation or for trial. The rule does not apply to professionals or practitioners who acquire information and develop opinions as actor[s] or viewer[s] in the course of treating the patient. [15]

Appellee argues that Rule 26(b)(4) does not apply to Dr. Haudenschild because he is not an expert witness. Instead, GWUH engaged Dr. Haudenschild as a quality assurance consultant for the purpose of drafting the Final Autopsy Report. [16] Appellants do not present, nor do we find in the record, any evidence that he was consulted in anticipation of litigation. [17] Accordingly, Rule 26(b)(4) does not apply to Dr. Haudenschild's testimony. [18]

### IV. Conclusion

Appellants were not prejudiced by the trial court's exclusion of evidence from a

---

13. *See Johnson, supra* note 6, 398 A.2d at 362 ("[T]he appellate court ... does not render its own decision of what judgment is most wise under the circumstances presented. Rather, it examines the record and the trial court's determination for those indicia of rationality and fairness that will assure it that the trial court's action was proper.").

14. *See supra* note 4.

15. *District of Columbia v. Mitchell,* 533 A.2d 629, 652 (D.C.1987) (citations and internal quotation marks omitted).

16. The trial court accepted this contention and appellants do not argue otherwise. Because Dr. Haudenschild was a quality assurance consultant, appellants' argument that he was required to be licensed to practice in the District of Columbia must fail. Appellee's expert testimony established that a consultant does not need to be licensed in every state from which he receives specimens for consultation.

17. In doing so, we also reject the assertion that Dr. Haudenschild was a "surprise" witness. His name clearly appeared as the author of the final autopsy report, a document that appellants had in their possession in a timely fashion, and one which they published to the jury themselves.

18. At oral argument, appellants also argued that Dr. Haudenschild's testimony should have been excluded on the grounds that it was privileged under the peer review statute. Yet, apart from a single vague allusion, their brief does not address this issue. Thus, we once again decline to address an issue that is not properly before us. "It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.... Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly ...." *Wagner v. Georgetown Univ. Med. Ctr.,* 768 A.2d 546, 554 (D.C.2001) (internal quotation marks and citations omitted).

meeting called by GWUH's peer review officer for the purposes of evaluating Dr. Alexander's performance. Additionally, the trial court properly admitted testimony by a quality assurance consultant. Since the testimony was not expert testimony under Rule 26(b)(4), its late disclosure was not error.

*Affirmed.*