*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 20-CV-14

SABRATHIA DRAINE ISHAKWUE, APPELLANT,

V.

DISTRICT OF COLUMBIA, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CAB-788-17)

(Hon. Hiram E. Puig-Lugo, Trial Judge)

(Argued January 20, 2022                    Decided July 21, 2022)

*Steven C. Kahn*, for appellant.

*Ethan P. Fallon*, for appellee. *Karl A. Racine*, Attorney General for the District of Columbia, *Loren L. AliKhan*, Solicitor General at the time the brief was filed, *Caroline S. Van Zile*, Principal Deputy Solicitor General, *Ashwin P. Phatak*, Deputy Solicitor General, and *Mary L. Wilson*, Senior Assistant Attorney General, were on the brief, for appellee.

Before GLICKMAN and MCLEESE, *Associate Judges*, and FERREN, *Senior Judge*.

FERREN, *Senior Judge*: This case concerns alleged violations of the D.C.

Whistleblower Protection Act (WPA),[1] which protects employees of the District of

---

[1] D.C. Code §§ 1-615.51, *et seq.* (2016 Repl.).

Columbia government against "retaliation or reprisal"[2] when, in the public interest, they report to "any person"[3] evidence of government "waste, fraud, abuse of authority, violations of law, or threats to public health or safety."[4] After termination of her employment with the District of Columbia Department of Youth Rehabilitation Services (DYRS), appellant Sabrathia Draine Ishakwue sued the District under the WPA. She alleges that her termination was in retaliation for concerns she had raised with her supervisors and the D.C. Department of Health about the medical treatment that DYRS was providing to youths in its custody who allegedly were showing signs of tuberculosis. A jury found in favor of the District, concluding that the information disclosed by appellant did not constitute "protected disclosures" under the WPA.[5] Appellant asks us to reverse the trial court's order denying her motion to set aside the verdict and to enter judgment in her favor, or, in the alternative, to order a new trial. In addition, as an independent reason for

---

[2] D.C. Code § 1-615.51.

[3] D.C. Code § 1-615.52(a)(6).

[4] D.C. Code § 1-615.51.

[5] Because the jury found that appellant had not proved by a preponderance of the evidence that she had made a protected disclosure, the jury – consistent with instructions on the verdict form – declined to make findings on the remaining issues: whether appellant's disclosures had been a "contributing factor" to her termination, and whether the District had clearly and convincingly proved its affirmative defense that appellant's employment would have been terminated even if she had not engaged in protected activity. See D.C. Code § 1-615.54(b).

setting aside the jury's verdict and ordering a new trial, appellant contends that she was prejudiced by the trial court's erroneous exclusion of evidence she proffered. We conclude that the verdict finding that none of the disclosures was "protected" under the WPA has adequate support in the record, and that the trial court did not abuse its discretion in excluding proffered evidence. Accordingly, we affirm the judgment.

## I.    Factual Background

To provide context for the alleged WPA violations, we shall first address appellant's employment history. In June 2015, appellant began working as a Clinical Nurse II at DYRS, where she was a probationary employee during her first year of employment. She reported to Michelle Jackson, a supervisory clinical nurse who, in turn, reported to Dr. Alsan J. Bellard, a medical doctor.

DYRS operated two juvenile detention centers:  the "New Beginnings" facility and the "Youth Services Center" (YSC), each of which had a medical unit staffed by nurses and overseen by Dr. Bellard. For the first few months of her employment, appellant was placed in the medical unit of New Beginnings. In

October 2015, however, appellant was transferred to the YSC medical unit, where she worked for the remainder of her DYRS employment.

At trial, Nurse Jackson testified that she and Dr. Bellard had jointly decided to transfer appellant for several reasons: appellant's conflicts with some of the nurses and correctional officers at New Beginnings; appellant's reports of "feeling bullied" there; and Nurse Jackson's concern that appellant not "be in that type of environment anymore." The Personnel Request Form (PRF) submitted to Human Resources by Nurse Jackson and Dr. Bellard stated that the decision was made for the "morale of the staff and for a safe working environment."

## A. First TB Disclosure and Reactions

At trial, appellant testified that, on December 23, 2015, she had performed the intake screening for a youth who did not speak English but, through an interpreter, reported that he had been coughing blood. The youth added that he had been on a long course of medication for an infection he could not recall the name of, and that he had lost the medication before completing the course. Explaining that in "standardized TB training, coughing blood is, like, one of the biggest clues that somebody might have TB," appellant testified that she had been particularly

concerned that the youth could have tuberculosis because he had been on a long course of medication, and that his failure to complete the treatment meant he could have been infectious.  Appellant then testified, more specifically, about her understanding of the DYRS TB protocols:  If, upon completion of the intake screening – including a tuberculosis skin test (PPD) – there is some suspicion that the youth may have TB, the nurse practitioner is supposed to order transport for the youth to a hospital facility until TB can be ruled out by conducting a chest X-ray.

Appellant further testified that after she "had got as much of the information from [the youth] as [she could]," she informed the supervisory nurse on duty that "she had a concern" because the youth had been coughing blood and had been on a course of medication that he had not completed.  Appellant also testified that, apart from conducting the initial interview and "maybe" placing his PPD, she did not perform any assessment of the youth.

According to appellant, she also had spoken with Nurse Jackson about the youth.  Appellant testified that this "conversation started around the 25th" of December (two days after the initial screening and placement of the PPD).  Appellant further testified that by the time of this conversation, she was concerned

about the youth's PPD reading, "which was 15 millimeters' induration,[6] [and] was considered positive."[7]  Appellant added that she had asked Nurse Jackson what the follow-up should be:  "what should have happened and what should we do?" Nurse Jackson wasn't sure, and, said appellant, each agreed to try to find out more information.

In sum, as to the nature and timing of appellant's information, she testified that after learning the result of the PPD test she had administered on December 23, she informed Nurse Jackson "around the 25th" of December that the youth had a 15 millimeter reaction, indicating a "positive" test for tuberculosis.

Nurse Jackson testified, however, that she did not recall a December 25 conversation with appellant, but in response to a hypothetical about a youth coughing up blood, Nurse Jackson agreed that a "further investigation" would have been the proper response because the youth's condition could have been

---

[6] An "induration" is "[t]he raising of the skin."

[7] Appellee's brief notes that appellant "suggested in her testimony that at some unspecified point the previous youth who had reported coughing up blood had a 15-millimeter reaction to a PPD" but that "[t]here is no other evidence in the record confirming that observation."  However, an email by Dr. Bellard dated December 29, 2015, confirms that, as of December 29, the youth had a PPD reading which the doctor described as "positive."

"numerous things," including "bronchitis" or "congestion." Nurse Jackson then testified that "we have a lot of kids that come in with bronchitis," and "[w]e can't put every kid on isolation because they're coughing up some type of blood in their sputum."

Dr. Bellard then testified, confirming that "if a kid comes in coughing blood . . . I would need to get additional history and conduct a thorough physical exam." But, he added, "[m]ore often than not, particularly in this age range, a report of coughing up blood could come from a post-nasal sinus drip" or other ailments, particularly bronchitis, "because a lot of our kids are heavy smokers." Dr. Bellard further testified that tuberculosis is very rare, especially in otherwise healthy young people; that it tends to affect small infants or the very elderly; and that, to his knowledge, no youth with active tuberculosis had ever been admitted to YSC. Dr. Bellard also explained that there is a difference between active tuberculosis, which is contagious, and latent tuberculosis, which is not. People with active tuberculosis "look sick" and have a cough, night sweats, and fever, he said, whereas people with latent tuberculosis are considered "perfectly fine" and have "essentially just had a reaction to the [tuberculosis skin] test" known as the PPD.

In response to appellant's concerns about the first youth, Dr. Bellard testified that he had reviewed the youth's chart and spoken over the phone with one of the nurse practitioners involved in his care;[8] that the nurse practitioner had explained to Dr. Bellard "what her rationale was for not making the decision" to isolate the youth; and that he had agreed with her treatment and care plan. Dr. Bellard then emphasized, more specifically, that the nurse practitioner had informed him that the youth had a history of coughing blood but did not have any recent weight loss; currently had no fevers; "sounded excellent" during the physical exam; and had "all of the indicators that the kid was normal and noncontagious."

On the other hand, an email from Dr. Bellard on December 29, 2015, to two nurse practitioners, including the one he believed he had spoken with over the phone, added confusion. In the email, he noted that he had been informed "*[t]oday*" that the youth had "both a positive PPD and positive quantiferon" (emphasis added).[9] He emphasized that "said youth reported 'coughing up blood,'

---

[8] While Dr. Bellard could not recall the date on which the conversation with the nurse practitioner occurred, he testified that it took place on the evening that the youth was brought into the facility, which was December 23, 2015, and that the conversation occurred before the youth was admitted "to the general population."

[9] QuantiFERON is a blood test used to test for tuberculosis. It is an alternative to the PPD, the skin test used to test for tuberculosis.

which is information that was not shared with me." Dr. Bellard then asked in his email: "Is there any reason that our index of suspicion[10] for TB was not raised when the youth reportedly was coughing up blood?" And the email had a subject line, "Youth with Likely Tuberculosis," adding an "importance" level of "[h]igh."

At trial, however, when asked to clarify his December 29 email, Dr. Bellard explained that he was referring to the fact that until that day he had not been informed that the youth was "actively coughing up blood," not merely someone with a "history of coughing up blood," and that Dr. Bellard, therefore, had been asking the nursing staff why the level of suspicion "wasn't raised *further*" based on this information (emphasis added). Dr. Bellard also reiterated that the youth had no other documented symptoms of tuberculosis.

### B.      Events Following the First Disclosure

On January 6, 2016, appellant submitted a same-day leave request to Nurse Jackson, which she denied. Nurse Jackson forwarded her denial to Dr. Bellard, explaining that she had said no because appellant had sought to take leave on the

---

[10] In his testimony, Dr. Bellard explained that the "index of suspicion" for tuberculosis "simply mean[s] that were there any other symptoms that could have pointed out that the kid had tuberculosis [?]."

very day she asked for it. Dr. Bellard replied: "Please pay close attention to her start date before her anniversary. I do not want her renewed, and we have to separate PRIOR to her anniversary." Nurse Jackson responded, "ok, we [are] on the same page." At trial, Nurse Jackson explained that she had not meant by this statement that appellant should be let go before her anniversary date in June 2016 but, rather, that she "wanted to sit down and talk" with appellant "[a]bout her job performance and her getting along with staff."

Later on January 6, despite the denial of leave – and over five hours after the scheduled beginning of appellant's shift – Nurse Jackson emailed Dr. Bellard to inform him that appellant had still not arrived at work. In the email, Nurse Jackson told the doctor that appellant was "playing games," and she ended by saying, "I'm ready to move forward with her. Some stress is just not worth it." At trial, Nurse Jackson testified that, by "move forward," she did not mean she was ready to move forward with appellant's termination; rather, she had meant "move forward to discuss with Sabrathia issues that [Nurse Jackson] believe[d] [Sabrathia] was having."[11]

---

[11] Nurse Jackson provided conflicting testimony regarding her role in appellant's termination. During trial, Nurse Jackson initially affirmed her deposition testimony that she had no role in the decision to fire appellant. But during later examination at trial, Nurse Jackson acknowledged that she did

(continued…)

Less than two days later, appellant emailed Nurse Jackson requesting 30 minutes of "comp time" for entering written orders on a new admit as requested by one of the nurse practitioners. In her email, appellant noted that she did not mind doing the task, but that there were lots of orders, which was why she had to stay until midnight. Nurse Jackson forwarded appellant's email to Dr. Bellard, stating "Fyi…this is becoming excessive with her OT [Overtime]/Comp time request." Dr. Bellard responded a few hours later, "Get the PRF [Personnel Request Form]; I'd rather us use agency than deal with this foolishness any longer."[12]

---

(…continued)

recommend to Dr. Bellard that appellant be fired once she had received appellant's same-day leave request followed by her no-show on January 6. And yet, during her examination the next day, Nurse Jackson again testified that she did not recommend to Dr. Bellard that appellant be fired on either January 6 or January 8 (when the final decision to terminate was made).

[12] With respect to his statement in the email that he'd "rather us use agency than deal with this foolishness," Dr. Bellard explained that "whenever an employee is either out sick or whatever, [the DYRS] can use agency or part-time staff to come in until we get the position filled," and that while "sometimes it takes a little bit more training to bring agency staff up to par . . . , in [his] opinion, it was much better to get someone who was willing to do the work and capable of doing it, rather than to sort of continue with the call-outs and the no-shows and everything else."

Dr. Bellard testified that the decision to fire appellant had been made definitively on January 8, 2016, when he instructed Nurse Jackson via email to prepare the PRF. Nurse Jackson similarly testified that she received an email from Dr. Bellard on January 6th or 8th "to move forward with [appellant's] paperwork."

## C. Second TB Disclosure and Reactions

On January 9, 2016, before any action had been taken on her employment, appellant read a PPD result for a second youth in DYRS custody. The youth had a 12 millimeter "induration," which appellant testified she had "been trained to know is positive."[13] Apart from taking the youth's vitals, appellant did not perform any clinical assessment but referred the youth to a nurse practitioner, who ordered a QuantiFERON blood test.[14] The nurse practitioner then sent the youth back to the youth's residence in the DYRS community without ordering a chest X-ray.

---

[13] In the 48 to 72 hours between appellant's placement of the PPD skin test and her taking the reading, the youth had not been isolated from the general population. A minimum of 48 hours are required from administering a PPD skin test to reading the result.

[14] *See supra* note 8.

At 2:00 p.m. on January 12, 2016, appellant sent an email to Nurse Jackson, copying Dr. Bellard, about a call-back she had received from Constance Williams, the Supervisor Nurse Coordinator at the D.C. Department of Health TB program. Nurse Williams had agreed to appellant's request to organize a TB clinical practice training session for DYRS staff. In this email, appellant also mentioned that she had consulted with Nurse Williams about a youth whom appellant had seen over the weekend with a 12 millimeter induration for whom a follow-up QuantiFERON test had been ordered. In the email, appellant added that Nurse Williams had informed her that a QuantiFERON test was "not the appropriate follow-up for this youth," and that the youth instead should be evaluated by a primary care provider, receive a chest X-ray as well as an assessment of symptoms, and then "begin treatment for latent TB."[15]

---

[15] It is not clear whether this email was the first time appellant's concerns about the second youth were disclosed to Nurse Jackson, who testified that she had not been aware of this youth before receiving appellant's email discussed above. During cross-examination, appellant testified that she "believe[d]" she had made the disclosure to Nurse Jackson regarding the second youth via email but was "not sure," and that she could "not remember exactly" what she had said to Nurse Jackson in reference to her concerns about the second youth's treatment. But, she added, she knew that she had "voiced concern that we had another TB that had not been possibly treated per protocol."

Eight minutes later, at 2:08 p.m., Nurse Jackson sent an email to Dr. Bellard: "So now she had made us look bad to the outside TB clinic."[16] At 5:30 p.m. the same day, Dr. Bellard sent an email to the entire nursing staff with the subject line "positive PPDs," stating that "[a]ll youth with positive PPDs should be treated as such" and, therefore, must have a chest X-ray and medication, without awaiting results of QuantiFERON testing. The doctor's email further stated that "[w]e should also refer these kids to the TB Clinic on the campus of DC General Hospital for follow-up." The email, however, did not mention what PPD reading qualifies as "positive."

The next day, on January 13, Dr. Bellard sent an email response to Nurse Jackson's email from the day before, stating: "I'm so sick of her." At trial, however, Nurse Jackson agreed that appellant had been right in bringing the issue about the second youth to the attention of Dr. Bellard.

---

[16] Nurse Jackson testified at trial that, by saying appellant had made them look bad, she did not mean that appellant had made the DYRS medical staff look as though they didn't know what they were doing but, rather, that appellant had not informed her bosses that she was reaching out to the TB clinic to get recommendations on how to treat kids with TB, which would have been the "proper etiquette."

In his testimony, Dr. Bellard took issue with appellant's characterization to Nurse Williams that a PPD reading of 12 millimeters was "positive." He explained that, "in order for the test to be positive in our healthy kids, [the PPD reading] has to be 15 or greater." And yet in his deposition, Dr. Bellard had stated that, according to DYRS TB policy, if a kid tested positive on the PPD, "meaning, you know, generally speaking, if it was . . . ten millimeters of firmness that you felt a couple days afterwards, that means it's positive." When presented at trial with this deposition testimony, however, Dr. Bellard explained that "it would be 15 millimeters in an otherwise healthy kid," and that ten would be used "[i]f the kid had any chronic illness." Dr. Bellard also noted that while the clinician's decision to order a QuantiFERON blood test after the PPD test was not DYRS policy at the time, it did not cause any harm to the youth, "was just a different way of screening and actually was the way that several other facilities do tuberculosis screening," and thus "was the action of one individual practitioner, one event."

### D. Appellant's Termination

On February 9, 2016, less than four months before completion of appellant's one-year probationary period, DYRS officially terminated her employment. Appellant was not given any reason for this action. However, the PRF submitted

to Human Resources by Nurse Jackson on January 13, 2016, described several conflicts between appellant and co-workers at New Beginnings, followed by a statement that appellant "has had some similar issues with staff members at YSC."[17]

The PRF went on to say that "[s]taff and Sabrathia have voiced concerns to management about each other's work ethics at YSC.  Management has decided that Sabrathia is not a good fit for our team."  As noted, supporting documentation for the PRF pertained only to incidents at her initial placement, New Beginnings.  In an email dated February 12, 2016, to the Chief of Staff of DYRS – to which Dr. Bellard attached the Letter of Termination he had served on appellant – Dr. Bellard said:  "I never mentioned any specific reason to [appellant]."

### E.    DOH Investigations

After her termination by DYRS, appellant filed a complaint with the D.C. Office of the Inspector General (OIG) in February 2016, raising numerous issues

---

[17]    The PRF explicitly identified the individuals appellant had had issues with at New Beginnings, as well as the steps taken to address them, such as remediation and meetings.  But, as noted, the PRF made only a general reference to "similar issues with staff members at YSC."

regarding medical and nursing practices at DYRS. OIG referred the complaint to the D.C. Department of Health (DOH), which conducted two separate investigations, one by Derek V. Brooks and a later one by Emilia M. Moran. Reports were issued in connection with each investigation.

## F. Trial Court Proceedings

Appellant filed suit against the District alleging WPA violations,[18] specifically that District's employees at DYRS had terminated her employment "at least in part" because she had "disclos[ed] to DYRS supervisors and managers information that she reasonably believed evidenced" among other things, "substantial danger to public health and safety." After discovery, the parties proceeded to trial. The jury returned a verdict for the District, finding that appellant had not made protected disclosures, and the trial court entered judgment accordingly. Because none of appellant's disclosures was found protected, the

---

[18] *See supra* note 1.

jury, per trial court instructions, did not reach the "contributing factor"[19] issue or the District's affirmative defense.[20]

Appellant moved for judgment notwithstanding the verdict or, in the alternative, for a new trial. The trial court denied the motion, and this timely appeal followed.

## II.    Discussion

Appellant contends that she is entitled to judgment as a matter of law because:   (1) the jury could not rationally have found that her tuberculosis disclosures were unprotected by the WPA and, further, because; (2) "the evidence at trial simply would not have permitted a reasonable jury to find against [her] on contributing factor, or in favor of the District on affirmative defense." Alternatively, appellant maintains that she is entitled to a new trial because the jury's "verdict on protected disclosures . . . [was] against the great weight of the

---

[19]  *See* D.C. Code § 1-615.54(b); *supra* note 5.

[20]  *See id.*

evidence"[21] and, in any event, because "erroneous evidentiary rulings significantly undermined her ability to persuade the jury that her disclosures were indeed protected." As elaborated below, we reject the claim of evidentiary error and conclude that the jury could have reasonably found that the tuberculosis disclosures were unprotected. Accordingly, we need not address "contributing factor" or the District's affirmative defense.

## A. Standard of Review

"This court will reverse a trial court's denial of a motion for judgment as a matter of law notwithstanding the verdict [JNOV] only if no reasonable juror, viewing the evidence in the light most favorable to the prevailing party, could have reached the verdict in the party's favor."[22] "The prevailing party is entitled to the

---

[21] *See, e.g.*, *Faggins v. Fischer*, 853 A.2d 132, 141 (D.C. 2004) (holding that trial court did not abuse discretion in granting motion for new trial where jury's verdict was "contrary to the great weight of the evidence").

[22] *District of Columbia v. Poindexter*, 104 A.3d 848, 854, 859 (D.C. 2014) (citation omitted) (vacating trial court's judgment in favor of appellee on her WPA claim on the basis that "appellee failed to proffer sufficient evidence from which a reasonable jury could find in her favor on the WPA claim because appellee's evidence failed to show that she made a 'protected disclosure' on any basis"). At oral argument, however, counsel for appellant relied on the following statement in *Ukwuani v. District of Columbia*, 241 A.3d 529, 546 (D.C. 2020), to challenge this court's deference to the jury's ultimate finding: "Whether actions by an employee

(continued…)

benefit of every reasonable inference from the evidence."[23]  Our review of a trial

court's ruling on a motion for judgment as a matter of law is de novo, and we

apply the same legal standard as the trial court does in ruling on the motion in the

first instance.[24]  "[A]s long as there is some evidence from which jurors could find

that the [prevailing] party has met its burden, a trial judge must not grant [a motion

for judgment as a matter of law]."[25]  Accordingly, this Court "must take care to

avoid weighing the evidence, passing on the credibility of witnesses or substituting

---

(…continued)

constitute protected activity is a question of law." (internal quotation marks omitted).  Appellant thus was suggesting that this court, on appeal, should revisit the jury's analysis of the trial record de novo.  To the contrary, *Ukwuani* should not be understood to suggest that result, if only because *Ukwuani* could not overturn the clear holding of *Poindexter* that a determination of "protected activity" is for the jury.  In any event, appellant did not contest at trial the jury's prerogative to determine whether appellant's disclosures were "protected" by the WPA.  Moreover, prior to oral argument, appellant's briefs appear to acknowledge that the jury is owed deference on this ultimate issue.  Finally, as we said in *Ukwuani*, 241 A.3d at 546 n.36:  "Out of fairness to the appellee, we generally do not consider a claim raised by an appellant for the first time at oral argument."  (citation omitted).

[23]  *Poindexter*, 104 A.3d at 854 (citing *Homan v. Goyal*, 711 A.2d 812, 817-18 (D.C. 1998)).

[24]  *NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr., Inc.*, 957 A.2d 890, 902 (D.C. 2008).

[25]  *Sullivan v. AboveNet Commc'ns*, 112 A.3d 347, 354 (D.C. 2015) (third alteration in original) (quoting *Scott v. James*, 731 A.2d 399, 403 (D.C. 1999)).

its judgment for that of the jury."[26]  "If 'the case turns on controverted facts and the credibility of witnesses, the case is peculiarly one for the jury.'"[27]

## B.      WPA Definition of "Protected Disclosure"

The WPA defines "protected disclosure," where relevant here, as "any disclosure of information . . . to any person by an employee . . . that the employee reasonably believes evidences,"[28] among other things, "[a] substantial and specific danger to public health and safety."[29]  "The employee must hold such a belief at the time the whistle is blown, and the belief must be both sincere and objectively reasonable."[30]  Our case law defines "reasonable" as whether "a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee [could] reasonably conclude that the actions of the government

---

[26]  *National R.R. Passenger Corp. v. McDavitt*, 804 A.2d 275, 280 (D.C. 2002).

[27]  *Id.* (quoting *Corley v. BP Oil Corp.*, 402 A.2d 1258, 1263 (D.C. 1979)).

[28]  D.C. Code § 1-615.52(a)(6).

[29]  D.C. Code § 1-615.52(a)(6)(E).

[30]  *Ukwuani*, 241 A.3d at 551.

evidence [illegality]."[31]  "This analysis does not hinge upon whether the action was ultimately determined to be illegal, but it does require that the employee's belief be objectively reasonable and that the employee has not ignored essential facts, including those which detract from a reasonable belief."[32]  "In other words, the fact finder must consider whether the employee reasonably should have been aware of information that would have *defeated* his inference of official misconduct."[33]

In assessing reasonableness, the jury is required to consider whether a disinterested observer with appellant's "background and expertise" could reasonably believe that the actions of the government evidence illegality.[34]  "A mere policy disagreement with an agency or supervisor is not enough to show . . . a substantial and specific danger to public safety; an employee 'must disclose such

---

[31]  *Zirkle v. District of Columbia*, 830 A.2d 1250, 1259-60 (D.C. 2003) (second alteration in original) (quoting *Lachance v. White*, 174 F.3d 1378, 1381 (Fed. Cir. 1999)).  Although *Lachance* is a federal case, it defines "reasonable" in the context of a "similarly worded federal WPA." *Id.* at 1259 n.13.

[32]  *Ukwuani*, 241 A.3d at 552 (internal quotation marks and brackets omitted).

[33]  *Id.* (emphasis in original).

[34]  *Zirkle*, 830 A.2d at 1258.

serious errors by the agency that a conclusion that the agency erred is not debatable among reasonable people.'"[35]

## C.     Appellant's Alleged "Protected Disclosures"

Appellant challenges the jury's verdict on the two, allegedly protected TB disclosures to her DYRS superiors:  the first in December 2015 regarding the DYRS responses to the youth who reported coughing blood ("the first TB disclosure"), and the second concerning the DYRS response in early January 2016 regarding the youth with a 12 millimeter PPD reading ("the second TB disclosure").[36]  These two disclosures allegedly reflected appellant's "reasonable belie[f]" in "good faith" that DYRS had "fail[ed] to test and isolate patients with classic symptoms of tuberculosis before returning them to crowded residential facilities" pursuant to established DYRS policy.  Appellant argues that, as a matter of law, the jury could not rationally have found that these disclosures were not

---

[35]     *Ukwuani*, 241 A.3d at 553 (quoting *Johnson (Nancy) v. District of Columbia*, 225 A.3d 1269, 1275 (D.C. 2020)).

[36]     Although appellant had argued to the trial court that there were three tuberculosis disclosures, counting the disclosures about the second youth to Bellard/Jackson and to DOH as two separate disclosures, she treats on appeal both disclosures regarding the second youth as one disclosure.

"protected" under § 1-615.52(a)(6)(E) as information evidencing a "substantial and specific danger to the public health and safety." Alternatively, she contends that the verdict was "against the great weight of the evidence," entitling appellant to a new trial.[37]

Appellant relies on the testimonies of Dr. Bellard and Nurse Jackson to support the reasonableness of her concern that both youths were likely contagious with TB and thus should have been isolated. In her brief, she stresses that "coughing blood, perhaps the most classic symptom of tuberculosis, by itself would lead a 'disinterested observer' with the medical training of a registered nurse to reasonably believe that inaction could potentially result in catastrophic health consequences" – a belief informed by appellant's "broad nursing experience" coupled with her direct experience providing care for the two youths. Also relying on criteria in a Federal Circuit decision, appellant adds that the dangers to public health and safety from the inadequate DYRS responses were "substantial and specific"[38] because, as summarized in her brief, "[t]hey were

---

[37] *See Faggins*, 853 A.2d at 141.

[38] *Chambers v. Dep't of Interior*, 602 F.3d 1370, 1376 n.3 (Fed. Cir. 2010) (explaining that "revelation of a negligible, remote, or ill-defined peril that does not involve any particular person, place, or thing, is not protected" under the federal WPA).

detailed; they were based upon first-hand knowledge of the facts, rather than upon unsupported conjecture; and they warned of public health dangers that were neither remote nor negligible."

### 1. First TB Disclosure[39]

We agree that the first youth's reported history of coughing up blood, when coupled with the eventual "positive" PPD reading, prima facie supports the objective reasonableness of appellant's concern that the youth should have been isolated from others living in the group facilities at the DYRS community. But the evidence supporting these two factors, in the context of other record evidence, leaves questions for the jury, not for this court to resolve as a matter of law.

In the first place, Dr. Bellard provided uncontradicted testimony that tuberculosis is "extremely rare, especially in otherwise healthy young people" – indeed, DYRS had never experienced an active case – and in any event coughing up blood is not determinative. As noted earlier, Dr. Bellard observed: "More often than not, particularly in this age range, a report of coughing up blood could range

---

[39] For purposes of this opinion, we treat and refer to appellant's purported disclosures regarding the first youth to her multiple supervisors as one disclosure.

from a post-nasal sinus drip, a kid who had bronchitis, because a lot of our kids are heavy smokers."[40] Nurse Jackson confirmed this in her testimony.[41]

Second, not all tuberculosis is active; some can be latent. Indeed, according to Dr. Bellard (as noted earlier), active TB is very rare – manifested by a "sick" look, a cough, night sweats, and a fever – whereas the latent variety has no physical manifestations, is not contagious, and thus poses no danger to others. There was no testimony that, aside from coughing blood, the first youth evidenced any physical manifestation of active TB. Moreover, according to Dr. Bellard, the supervisory nurse on duty had informed him that the first youth "seemed fine" and that "[h]e hadn't had any recent weight loss, currently did not have any fevers. In fact, on the physical exam he sounded excellent and [had] all of the indicators that the kid was normal and noncontagious."[42]

---

[40] Appellant dismisses as irrelevant the evidence that DYRS has no record that a resident with active TB was ever admitted to the YSC facility, and that neither of the two youths was ultimately shown to have contracted TB. She argues irrelevancy because she was not aware of this information at the time she made the disclosures. Appellant further contends the District's evidence that TB is a rare disease and that the symptoms exhibited by the youths could indicate a different disease does not detract from the objective reasonableness of her belief.

[41] *See supra* Part I.A.

[42] According to Dr. Bellard, if an active TB patient were to enter the courtroom, "it would be pretty evident something's wrong with them" whereas a

(continued…)

Third, in determining whether a whistleblower-employee has the required "sincere and objectively reasonable" belief that a "substantial and specific danger to public health and safety"[43] is afoot, the jury must find that the employee held that belief "at the time the whistle [was] blown."[44] Accordingly, in order to find a "protected"[45] WPA disclosure here, the jury had to find that appellant knew "around [December] 25th" that the first youth had a "15 millimeter" PPD reading – based on "standard documentation with his results"[46] – and that she imparted this knowledge to Nurse Jackson. Yet, the undisputed testimony at trial was that a minimum of 48 hours is required from the time of the placement of the PPD to

---

(…continued)
person with latent tuberculosis would appear "perfectly fine." Having the burden of proof, appellant did not present any evidence contradicting Dr. Bellard's testimony that a person with active tuberculosis would necessarily appear unwell. And appellant herself confirmed that apart from conducting the intake interview and "maybe" applying (but not evaluating) the youth's PPD skin test, she did not perform any further medical assessment of the youth.

[43] D.C. Code § 1-615.52(a)(6)(E).

[44] *Ukwuani*, 241 A.3d at 551.

[45] D.C. Code § 1-615.52(a)(6).

[46] Appellant did not directly read the PPD results.

when it can be *read*,[47] let alone documented, and the youth's PPD was placed on December 23rd. Appellant, who had the burden of proof on this issue, did not present any evidence that the youth's PPD results had been documented as of the time she spoke to Nurse Jackson[48] "around" December 25, 2015.

Moreover, if appellant informed Nurse Jackson "around [December] 25th" that the first youth was "positive," she did so between two and four days *before* Dr. Bellard's December 29 email stating that he had learned "*today*" about the youth's "positive" PPD (emphasis added). This possible timing discrepancy implicated the credibility of both appellant and the doctor, leaving the jury to resolve whether appellant had the required "sincere and objectively reasonable" belief when she essentially informed Nurse Jackson that the failure of DYRS officials to isolate the first youth from all other youths in the DYRS community posed a "substantial and specific danger to public health and safety."[49]

---

[47] *See supra* note 13.

[48] *See Freeman v. District of Columbia*, 60 A.3d 1131, 1152 (D.C. 2012) (stating that the WPA does not "institute a lottery scheme under which would-be whistleblowers receive protection for making unsupported accusations if . . . for reasons unknown to them, the accusations turn out to be supportable after all").

[49] D.C. Code § 1-615.52(a)(6)(E).

In sum, the record reveals no physical indication that, at the time of appellant's disclosure, the first youth had active TB, other than coughing blood (an inconclusive indication), and the record offers only inconclusive testimony as to when appellant knew that the first youth's PPD was positive. We therefore cannot say that the trial court, or this court, could responsibly nullify the jury's verdict, which may well have rejected appellant's assertion that she had known the youth's PPD reading was "15 millimeters" (and thus positive) at the time she disclosed her concern to Nurse Jackson "around" December 25, 2015.

The jury was free to credit Dr. Bellard's and Nurse Jackson's respective testimonies, which it apparently did. Moreover, consistent with the jury instructions, even if much of the information disclosed at trial by Dr. Bellard was not known to appellant at the time of her disclosure about the first youth, the jury could have reasonably concluded that a registered nurse with appellant's "background and expertise,"[50] who had been serving at-risk youth at DYRS for several months, should have been aware of the "readily ascertainable" facts required to support a protected disclosure, such as the fact that no youth with active

---

[50] *Zirkle*, 830 A.2d at 1258.

TB had ever been admitted to YSC, and that a youth with active, and therefore contagious, TB would necessarily appear unwell.[51]

Appellant's argument that the objective reasonableness of her concern is "established most clearly by the text of the DYRS policy on infectious diseases" misses the point. The DYRS policy only requires isolation of a youth with "suspected or confirmed" tuberculosis, as well as youths who are "symptomatic for tuberculosis." The District does not dispute that a youth suspected of being contagious with tuberculosis should be isolated from the general population; the issue here is whether appellant's suspicion that the first youth was contagious with tuberculosis was objectively reasonable in the first place.

Thus, viewing the evidence, as we must, in favor of the District as the prevailing party, we conclude that there was ample record evidence to support the jury's verdict that the first disclosure was not protected.

---

[51] *See Freeman*, 60 A.3d at 1152 (stating that "[a]n employee cannot attain whistleblower status by dispensing with due diligence and remaining unjustifiably ignorant of information that would have refuted or cast doubt on his charges").

## 2. Second TB Disclosure

The evidence also was sufficient for a reasonable juror to reject appellant's alleged belief that DYRS should have presumed the second youth contagious with tuberculosis – and responded accordingly – without more evidence than a PPD reading of 12 millimeters. Contrary to appellant's contention, her evidence did not conclusively establish a "positive" PPD reading indicating tuberculosis, active or latent, for the youth in question.[52]

Appellant's evidence that the youth's 12-millimeter induration was "positive" was, *first*, her own trial testimony that she "been trained to know" that a 12 millimeter induration is positive; *second*, appellant's description of her phone conversation with DOH Nurse Williams,[53] who recommended "treatment for latent

---

[52] Dr. Bellard's January 12, 2016, email to the entire nursing staff, stating that youths with "positive PPDs" should have a chest X-ray instead of awaiting the results of QuantiFERON testing, did not define what constitutes a "positive" PPD. Nor did the DYRS *Policy and Procedures Manual* at the time. However, there is no dispute that a "positive PPD" meant the size of the PPD induration (in millimeters) large enough to indicate the presence of tuberculosis in the body – a size disputed by the parties.

[53] Nurse Williams was the person appellant had been contacting for DOH assistance in updating the DYRS training program.

TB" for the youth[54] (a recommendation appellant reported by email to Nurse Jackson); and *third*, Nurse Jackson's testimony that an "elevated PPD reading" is a 5 millimeter induration.

These assertions were contradicted by Dr. Bellard's testimony that, "in an otherwise healthy kid," a PPD reading of 15 millimeters or more would be considered positive, and that 10 millimeters would be considered positive "[i]f the kid had any chronic illness." The jury was entitled to credit Dr. Bellard's testimony over appellant's evidence, notwithstanding his earlier statement on deposition, admitted in evidence, that "generally speaking" a 10 millimeter induration is considered "positive" for youth. Dr. Bellard explained at trial, however, that his deposition testimony "would have been incorrect."[55] Appellant presented no evidence that the youth was not healthy or had any other symptom

---

[54] The record contains only appellant's email to Dr. Bellard and Nurse Jackson describing her conversation with Nurse Williams, and it is not clear whether appellant had informed Nurse Williams that the youth had an induration of 12 millimeters or had simply characterized the youth's PPD reading as "positive" to Nurse Williams.

[55] Specifically, when presented at trial with his deposition testimony that "generally speaking" a 10 millimeter induration would be "positive," Dr. Bellard stated: "I could have said that, but that would have been incorrect, and I can give you several sources that state that it would be 15 millimeters in an otherwise healthy kid. If the kid had any chronic illness, then ten is used; and then it goes down to five for someone who's HIV positive or immunocompromised."

indicating tuberculosis, and appellant confirmed at trial that she did not undertake any other clinical assessment of the youth during his PPD reading apart from taking his vitals.

In light of the foregoing testimony, and in the context of Dr. Bellard's earlier-discussed testimony regarding the rareness of TB in healthy youths and in the United States – as well as his testimony that there was no record evidence that a youth with active tuberculosis had ever been admitted into YSC – we cannot say that no reasonable juror, viewing the evidence in the light most favorable to the prevailing party, could have reached the verdict in the District's favor.

## D. Exclusion of Evidence

Appellant also challenges the trial court's rulings that excluded (1) reports from two DOH investigations resulting from her complaint to OIG after she was fired, and (2) evidence pertaining to the historic *Jerry M.* investigation.[56] Ordinarily, we review the trial court's decision on admissibility of evidence for

---

[56] In 1985, a class action was filed on behalf of DYRS residents which resulted in the issuance of a consent decree the following year that required DYRS to comply with various American Public Health Association (APHA) standards related to numerous areas, one of which related to communicable diseases.

abuse of discretion.[57]  "Even where we find error, 'we may find that the fact of error in the trial court's determination caused no significant prejudice and hold, therefore, that reversal is not required.'"[58]

### 1. The DOH Investigations

The evidence from the two DOH investigations consists primarily of the June 2016 report authored by Derek V. Brooks and the September 2016 report prepared by Emilia Moran.  Appellant argues that certain statements in the reports substantiate the objective reasonableness of her belief that the two youths posed a substantial and specific danger to public safety.

---

[57]  *See, e.g.*, *Stone v. Alexander*, 6 A.3d 847, 851 (D.C. 2010) (citations omitted).  Appellant's contention that we should review de novo the exclusion of the DOH evidence – apparently on the ground that it was admissible as a matter of law – has no merit.  The trial court excluded all evidence after January 6th, which it concluded was the date (not June 8, as Dr. Bellard testified) when the DYRS decision to terminate appellant's employment was made.  The date of termination had no bearing on admissibility of the DOH reports; and, as elaborated below, exclusion of that evidence was not erroneous either as an abuse of discretion or as a matter of law.

[58]  *Id.* (quoting *Johnson (James) v. United States*, 398 A.2d 354, 366 (D.C. 1979)).

Appellant does not identify any evidence contained in the reports which could support the objective reasonableness of her belief that the youths were contagious. Her opening brief makes only general reference to "numerous shortcomings in DYRS's medical and nursing practices" documented in the reports, "many of which were the subject of Ishakwue's protected disclosures." As we have previously stated, "it is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones."[59] Hence, appellant cannot rely upon unidentified statements in the two reports as supporting the reasonableness of her belief at the time she made the disclosures.

The only evidence appellant explicitly references in her opening brief is deposition testimony by investigator Brooks, who allegedly "corroborated [appellant's] disclosure that a DYRS resident with an elevated PPD level was improperly released into the general population." The District points out, however, that appellant failed to include the deposition transcript as an exhibit to her opposition motion in which she referenced the testimony. That testimony,

---

[59] *Johnson (Nancy)*, 225 A.3d at 1276 n.5 (quoting *Gabramadhin v. United States*, 137 A.3d 178, 187 (D.C. 2016)).

therefore, is not part of the record before us on appeal, and thus we have no basis for considering it.

For the first time in her reply brief, appellant also highlights alleged statements in the Brooks report that DYRS transferred "an at-risk youth to a shelter house without knowing whether he was infected with tuberculosis"; that "[u]pon his return to the medical unit, DYRS referred him to a tuberculosis clinic for treatment"; and that a second youth "with elevated PPD levels . . . was reintegrated into the community before treatment was completed."  As an initial matter, "[i]t is the longstanding policy of this court not to consider arguments raised for the first time in a reply brief."[60]  In any event, assuming the two youths discussed in the report were the same youths that were the subject of appellant's disclosures, the statements in the report do not substantiate the objective reasonableness of appellant's concern.[61]  That one of the youths was eventually referred to the TB

_____

[60] *Holbrook v. District of Columbia*, 259 A.3d 78, 86 n.2 (D.C. 2021).

[61] The report does not actually state that DYRS transferred an at-risk youth "without knowing whether he was infected with tuberculosis"; it simply notes that "prior to reading the PPD, the youth was transferred to a shelter house."  Similarly, the report does not state that a second youth with "elevated PPD levels was reintegrated into the community before treatment was completed"; it simply notes that his "PPD was 15 mm on 12/29/15 when he was brought from a shelter house to YSC for reading," and that he was "immediately referred to Children's National Medical Center for treatment."  This statement could actually undercut appellant's

(continued…)

clinic does not establish that the youth was contagious, as the youth may have been receiving treatment for latent tuberculosis. Moreover, the fact that the two youths were not isolated prior to their PPD readings was already part of the record and was undisputed.

Accordingly, the trial court did not abuse its discretion, let alone err as a matter of law, in denying admission of the DOH investigative reports in evidence.

## 2. The Jerry M. Investigation

Appellant contends that the trial court abused its discretion by refusing to allow evidence from the *Jerry M.* investigation.[62] Appellant asserts that "[t]he jurors may well have viewed the tuberculosis disclosures more favorably if they had known that Ishakwue was not alone in challenging DYRS's communicable

---

(…continued)
argument that she knew, when she made the disclosure to Nurse Jackson regarding the first youth "around" December 25, 2015, that the youth had had a positive PPD reading.

[62] *See supra* note 55.

disease protocols," and that the proposed evidence "was relevant under *Zirkle's* 'disinterested observer' standard."[63]

In the first place, it is not clear exactly what evidence appellant seeks to introduce. Her brief cites Federal Rules of Evidence 404(b) and 408, as well as case law from other jurisdictions, establishing that civil consent decrees may be admitted for limited purposes other than proving liability. The 1986 consent decree, however, has not been produced as part of the record in this case. Moreover, the record here pertaining to the *Jerry M.* litigation consists of only a few disjointed pages from a 2016 Special Arbiter's Report to the court regarding the District's progress toward meeting work plan requirements at DYRS facilities. That evidence includes, as background, a sentence that the 1986 consent decree required DYRS to comply with various APHA standards[64] related to various areas, including communicable diseases. That generalized statement, without more, does not explain its relevance.

---

[63] *See* 830 A.2d at 1259-60.

[64] *See supra* note 58.

Even if admissible, therefore, such evidence would have had no discernible relevance to the question of whether appellant's communications regarding the two youths she suspected of having tuberculosis amounted to protected disclosures under the WPA.[65]

*****

For the foregoing reasons, the trial court's order denying appellant's motion to set aside the jury verdict is affirmed.

*So ordered.*

---

[65] DYRS signed the civil consent decree in *Jerry M.* in 1986 (almost 30 years before the events at issue in this case) in which it agreed to comply with APHA standards on communicable diseases. That has nothing to do with the reasonableness of appellant's belief as to whether DYRS was following the proper protocols with respect to the two youths in 2015-16. Furthermore, the pages of the Special Arbiter's Report included in the record contain no suggestion that DYRS was currently failing to comply with APHA standards regarding communicable diseases. Indeed, the relevance of the evidence, if any, would be completely outweighed by its potential for unfair prejudice to the District.